E-FILED
Wednesday, 27 July, 2011  04:50:07 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL MOORE; CHARLES HOOKS; PEGGY FECHTER; JON MAIER; SECOND AMENDMENT FOUNDATION, INC.; and ILLINOIS CARRY, <br><br>    Plaintiffs, <br><br>-vs- <br><br>LISA MADIGAN, in her Official Capacity as Attorney General of the State of Illinois; and HIRAM GRAU, in his Official Capacity as Director of the Illinois State Police, <br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br>No. 11-3134 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**I.    Introduction**

Plaintiffs, Second Amendment Foundation, Illinois Carry, and four individuals, claim that two provisions of the Illinois Criminal Code are unconstitutional, as applied to persons otherwise entitled to possess firearms. Relying on *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), plaintiffs contend that these provisions unconstitutionally restrict the right to carry firearms in violation of the Second Amendment to the Constitution of the United States.

The first provision challenged by plaintiffs, section 24-1 of the Criminal Code (720 IlCS 5/24-1), provides that, subject to an extensive list of exemptions found in section 24-2, a person commits the offense of unlawful use of weapons by, *inter alia*, carrying loaded weapons in a vehicle or concealed on one's person, except when on one's own land, one's fixed place of business, or on the land of another with that person's permission; possesses

a firearm silencer; possesses a fully automatic weapon or sawed-off shotgun; possesses firearms in a place authorized to sell liquor; or carries a loaded weapon in a city, except when on one's own land, one's fixed place of business, or on the land of another with that person's permission. The second section plaintiffs challenge, section 24-1.6 (720 IlCS 5/24-1.6), creates the offense of aggravated unlawful use of a weapon and, subject to exceptions in section 24-2, applies when aggravating factors are present such as when the weapon is uncased, loaded and immediately accessible; the offender is committing certain drug crimes; the offender is threatening violence against another; the offender has had an order of protection taken out against him or her; or the offender is under 21 and the weapon is a handgun.

## II.  The Challenged Statutes Do Not Infringe The Second Amendment Right To Bear Arms

Judicial review of a Second Amendment claim proceeds in two steps. First, the court must determine whether the activity at issue falls within the Second Amendment's "scope." *Ezell v. City of Chicago*, slip op. at 30 (7th Cir. July 6, 2011). This requires "a textual and historical inquiry into original meaning" to determine whether:

> The restricted activity is "protected by the Second Amendment in the first place." *Id.* [I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment — 1791 [for federal regulations] or 1868 [for State regulations] — then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

*Id.*, slip op. at 32-33.

"If the government cannot establish this" because "the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," the

court moves to the second step: applying means-ends scrutiny. *Id.*, slip op. at 33.

Historical evidence indicates that, throughout American history, the scope of the right to bear arms has never included a right to carry concealed weapons in public. Thus, concealed carry is outside the Second Amendment's "scope," and Illinois's concealed carry ban is constitutional for this reason alone. Moreover, even assuming some or all of Illinois's restrictions on carrying weapons in public are within the Second Amendment's "scope," they are still constitutional because they satisfy means-ends scrutiny.

### A.  The Scope Of The Second Amendment Does Not Include A Right To Carry Concealed Weapons

Historically, the right to bear arms does not include a right to carry concealed weapons in public. This "universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional," for "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Republican Party of Minn. v. White*, 536 U. S. 765, 785 (2002) (internal quotation marks omitted). Accordingly, Illinois's ban on carrying concealed weapons in public does not apply to conduct within the Second Amendment's scope and is therefore constitutional.

States have banned concealed weapons from the very earliest days of the Republic, *see* Clayton E. Cramer, Concealed Weapon Laws of the Early Republic 143-52 (1999) (collecting examples), and courts have consistently upheld such bans. The Supreme Court recognized this fact in *Heller*. "Like most rights," the *Heller* Court wrote, "the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. "For example," the Court continued, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.*; accord, e.g., *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617, *1 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 616-17 (1840); *Nunn v. State*, 1 Ga. 243, 251 (1846); *State v. Chandler*, 5 La. Ann. 489, 489-90 (1850); *Day v. State*, 37 Tenn. 496, 500 (1857); *State v. Jumel*, 13 La. Ann. 399, 400 (1858). Indeed, the proposition was so uncontroversial that, during the Nineteenth Century, the Supreme Court recognized, in dicta, that "the right of the people to keep and bear arms [under the Second Amendment] is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).

This long-established tradition of banning concealed weapons is alone fatal to plaintiffs' challenge to Illinois' concealed carry ban. Because concealed weapons bans were never thought to infringe the right to bear arms, there is no right to carry concealed weapons within the Second Amendment's scope, and those portions of the challenged laws relating to concealed weapons are constitutional.

### B.    The Challenged Statues Satisfy Means-Ends Scrutiny

Plaintiffs' challenge to the concealed-carry ban also fails on another, independent ground. Here plaintiffs' challenge to the open carry ban fails as well, for both prohibitions satisfy means-ends scrutiny, step two of the Second Amendment analysis.[1] The form this

---

[1] Defendants also raise, in order to preserve for later review, the argument that, like the concealed carry prohibition, Illinois' open carry ban falls entirely outside the Second Amendment's scope. *See* Part II.C, *infra*.

scrutiny takes depends "on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, slip op. at 33. A "severe burden on the core Second Amendment right" requires "an extremely strong public interest justification and a close fit between the government's means and its end." *Id.* at 44-45. Conversely, "laws restricting activity closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* Thus, the Seventh Circuit has applied intermediate scrutiny to firearms laws regulating non-core activities, *see United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); *United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir. 2010), and near-strict scrutiny to laws implicating the core right to self-defense in the home, *see Ezell*, slip op. at 46 (requiring a "more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny'").

The Court should apply intermediate scrutiny here; the Supreme Court has never held that there is a "core" Second Amendment right to carry firearms in public for personal self-defense, nor does American or English history suggest such a "core" right. Under intermediate scrutiny, the concealed and open carry bans are constitutional, for they are substantially related to the important governmental objective of preventing armed violence.

    **1.**    **The Court Should Apply Intermediate Scrutiny Because The "Core" Of the Second Amendment Right Does Not Extend Outside Of The Home**

Under the Seventh Circuit's *Ezell* decision, the level of scrutiny a firearms law receives depends "on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, slip op. at 33. Under *Heller*, "the

core component" of the Second Amendment is "the right to possess operable firearms — handguns included — for self-defense, most notably in the home." *Ezell*, slip op. at 2. "What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]." *Skoien*, 614 F.3d at 640. Nor does *Ezell* indicate what tests should be used to determine whether an activity is "core." Indeed, the court in *Ezell* had no need to do so, for the plaintiffs there asserted only their "core Second Amendment right to possess firearms at home for protection."[2] Slip op. at 23.

The choice of test does not matter here. Under any test, the right to carry firearms for personal self-defense outside the home — openly or concealed — is not "core." In *Heller*, the Supreme Court held that the Second Amendment protects the right to possess a handgun for self-defense in the home. 554 U.S. at 635. The Court carefully limited this holding, cautioning that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation," *Heller*, 554 U.S. at 595, and the Supreme Court has never held that the Second Amendment guarantees a right to carry weapons for self-defense outside the home. Moreover, even if the Second Amendment does apply to places outside the home, courts "have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions." *Masciandaro*, 638 F.3d at 475.

In the absence of support from *Heller*, this Court should not expand the right recognized in that decision beyond the home. When courts stretch *Heller* beyond its

---

[2] The *Ezell* court made passing reference to "the core right to possess firearms for self-defense." Slip op. at 46. But this appears to be shorthand for the right to possess firearms for self-defense *in the home* — the right at issue in that case and the one discussed throughout the rest of the opinion. *See, e.g., id.* at 2, 15, 23, 28, 29, 36.

holding, they "circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee." *Masciandaro*, 638 F.3d at 475. Removing a vital issue of public safety from the democratic process "is serious business," *id.,* and should not be done lightly. Moreover, the costs of miscalculation are high. "[N]o one doubts that the goal" of gun control laws, i.e., "preventing armed mayhem, is an important governmental objective." *Skoien*, 614 F.3d at 642; *see also United States. v. Salerno*, 481 U.S. 739, 748 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). "If ever there was an occasion for restraint, this would seem to be it." *Masciandaro*, 638 F.3d at 476.

In light of these concerns, courts nationwide have declined to extend the Second Amendment's protections beyond the home. *See Masciandaro*, 638 F.3d at 475 ("On the question of *Heller's* applicability outside the home environment, we think it prudent to await direction from the Court itself."); *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly."); *People v. Dawson*, 934 N.E.2d 598, 605-07 (Ill. App. Ct. 2010) (declining to extend Second Amendment outside of home because Supreme Court "deliberately and expressly maintained a controlled pace of essentially beginning to define this constitutional right"); *cf. People v. Yarbrough*, 169 Cal.App.4th 303, 312-14 (2008) (upholding California's concealed weapons law because it did not implicate *Heller*'s core holding regarding weapons in the home); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (rejecting Second Amendment claim, under plain error review, because Supreme

Court has not held that Second Amendment extends outside the home). One court concluded, "We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475. For these reasons, this Court should not announce a "core" right to possess firearms for self-defense outside the home.

These are not the only reasons, however. The relevant history also indicates that there is no "core" Second Amendment right to carry firearms for personal self-defense in public places. *Heller* grounded its holding, in part, on the fact that "[f]ew laws in the history of our Nation have come close to the severe restriction" that the District of Columbia placed on guns in the home. 554 U.S. 629. Such is not the case here. State and local governments frequently restricted citizens from carrying firearms in public when the Fourteenth Amendment was ratified. *See, e.g.*, Act of Nov. 18, 1858, Corp. Laws of the City of Washington D.C., at 114 ("it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as a dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington") (Robert A. Waters 1853 & 1860); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding "ope[n]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); Tex. Act of Apr. 12, 1871, ch. 34 (prohibiting carrying of pistols without "immediate and pressing" reasonable grounds to fear "immediate and pressing" attack or for militia service); *accord Aymette v. State*, 1840 WL 1554, *4 (Tenn. 1840) ("The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense."); *State v.*

*Buzzard*, 1842 WL 331, *5 (Ark. 1842).³

The history at the time of the Second Amendment's ratification is even clearer on the point. "[T]he Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," *Heller*, 554 U.S. at 599 (internal quotations omitted), and "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" at English law, *id.* at 592 (emphasis in original). Thus, if history indicates that our English ancestors did not consider an activity to be a "core" right, then that activity cannot be within the Second Amendment's core protections.

In fact, history demonstrates that neither English statutory nor common law provided any right to carry weapons in public. For nearly seven hundred years, English law criminalized the practice. The Statute of Northampton, one of the earliest laws regulating weapons possession, provided that, unless he was on the King's business, no man was permitted to "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). English courts upheld the continuing vitality of this law, even hundreds of years later. In *Sir John Knight's Case*, (1686) 87 Eng. Rep. 75 (KB), for example, the Chief Justice noted that carrying arms in public was not merely banned by the Statute of Northampton, but was "likewise a great offence at the common law." *Id.* The reason was not just that carrying arms in public was dangerous, but also that it was an

---

³The Wyoming territorial and District of Columbia statutes cited could not have existed if the Second Amendment protected the right to carry arms in public.

insult to the sovereign and the social compact: "as if the King were not able or willing to protect his subjects." *Id.* In this way, the Statue of Northampton was "but an affirmance" of the longstanding common law rule that there is no right to carry weapons in public. *Id.* And the Statute remained the law of Massachusetts, North Carolina, and Virginia, nearly verbatim, even after the ratification of the Constitution. *See* Patrick J. Charles, *Scribble Scrabble, The Second Amendment, & Historical Guideposts: A Short Reply to Lawrence Rosenthal & Joyce Lee Malcolm*, 105 Nw. U. L. Rev. Colloquy 227, 237 (2011).

The most prominent common law scholars agreed that there was no right to carry arms outside the home. Lord Edward Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593-94 (1980) (internal markings omitted), confirmed — in a chapter entitled "Against going or riding armed," *see* 3 Coke, Institutes of the Laws of England 160 (1797 ed.) — that English law forbade carrying weapons in public. Under the Statute of Northampton, Coke explained, one could possess weapons in the home "to keep his house against those that come to rob, or kill him, or to offer him violence in it." *Id.* "But he cannot assemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place." *Id.* at 162. That the weapons were carried for self-defense was no excuse under the Statute. *Id.* Indeed, even an immediate threat of harm did not permit one to go armed in public spaces. *Id.*

William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (internal quotations omitted), confirmed that there was no right to carry weapons in public for personal self-defense.

"The offence of riding or going armed with dangerous or unusual weapons," he wrote, "is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the [Statute of Northampton], upon pain of forfeiture of the arms and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."  William Blackstone, 4 Commentaries *149.

In short, English law acknowledged a right to use arms to defend one's home — the "core" right recognized in *Heller*.  *See* 3 Coke, Institutes at 160.  It did not recognize any right to carry weapons in public for personal self-defense.  On the contrary, English statutes and common law forbade the practice.  Accordingly, carrying a weapon in public cannot be a "core" Second Amendment right.  Thus, to the extent that carrying firearms outside the home for personal self-defense implicates the Second Amendment at all (and history proves that it does not), it lies "closer to the margins of the Second Amendment right," and therefore "may be more easily justified" under means-ends analysis. *Ezell*, slip op. at 45.  As a result, the proper standard for evaluating plaintiffs' constitutional claim is intermediate scrutiny.

## 2. The Challenged Statutes Satisfy Intermediate Scrutiny

To satisfy intermediate scrutiny, a law must be "substantially related to an important government objective."  *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  Illinois's prohibition against the carrying of loaded — and readily loadable — firearms in public places easily satisfies this standard.  The State's interest in protecting the public health and safety has long been recognized as a compelling objective for purposes of constitutional scrutiny, *see Salerno*, 481 U.S. at 750, 754-55, and "no one doubts" that "preventing

armed mayhem . . . is an important governmental objective," *Skoien*, 614 F.3d at 642.

The challenged provisions are substantially related to this compelling interest in public safety. The "benefits" of a firearm regulation need not be "established with admissible evidence," for a court may also look to "logic" in deciding whether a "substantial relation" exists between the regulation and its objective. *Skoien*, 614 F.3d at 641-42; *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (speech regulations may be upheld against First Amendment challenges "based solely on history, consensus, and 'simply common sense'"). Logic supports the notion that the provisions that plaintiffs challenge will make it more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, purposefully or accidently. Even if empirical evidence were necessary (which it is not), it, too, supports the statutes' common-sense goals: Preliminary studies indicate that the passage of so-called "right to carry" laws in other States corresponds with a measurable increase in crime. *See* John J. Donohue, *Guns, Crime, & the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623, 630-39 (2004). Evidence from other States also suggests that permitting systems consistently fail to keep guns out of the hands of dangerous people. *See, e.g.*, Violence Policy Center, *Concealed Carry Killers* (2009), *available at* http://www.vpc.org/ccwkillers.htm (concealed carry permit-holders have killed 309 people, including 11 police officers, since May 2007).

In sum, the challenged statutes serve an important government interest in ensuring public safety, and they further that interest by reasonable means supported by common sense and empirical evidence. Accordingly, the open and concealed-carry bans satisfy intermediate scrutiny. Plaintiffs' complaint, therefore, should be dismissed.

### C. The Scope Of The Second Amendment Does Not Extend To Carrying Weapons Outside Of The Home[4]

The Second Amendment did not create a new right, but rather "codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson*, 165 U.S. at 281). And, since its codification, this right has remained unaltered, for constitutional rights are "enshrined with the scope they were understood to have when the people adopted them," regardless of whether future commentators think their scope should change. *Heller*, 554 U.S. 634-35. Thus, it is a " well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government," *McDonald*, 130 S.Ct. at 3035 n.14 (plurality op.), for — because constitutional rights are static — there is no reason they should apply differently. In other words, there is only one Second Amendment: the English right that the Amendment's framers codified in the Constitution.

As discussed in Part II. B, *supra*, there was no English right to carry firearms in public for personal self-defense at the time of the Second Amendment's ratification. That history should dictate the outcome of this case — because the Second Amendment, as originally understood, did not include *any* right to carry weapons in public for personal self-defense, such activity is outside the Amendment's "scope" and cannot be the basis of a successful constitutional challenge.

In *Ezell*, however, the Seventh Circuit held that, where "state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the

---

[4] While defendants do not believe that the Court needs to reach this issue and recognize that this Court cannot overrule the Seventh Circuit on this point, defendants have included this section to preserve the issue for later review.

Second Amendment's scope as a limitation on the States depends on how the right was understood when the *Fourteenth Amendment* was ratified." Slip op. at 30 (emphasis added). Thus, according to *Ezell*, the Second Amendment actually has *two* historical "scopes" — one for federal laws, determined by Eighteenth Century history, and another for state laws, determined by Nineteenth Century history.

This is mistaken. The Supreme Court has "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *McDonald*, 130 S.Ct. at 3035 (plurality op.) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)). Moreover, *Ezell* is mistaken in a way that may alter the outcome of the case in this Court. While the original history of the Second Amendment demonstrates no right to carry weapons for self-defense outside the home, *see* Part II.B.1, *supra*, perceptions began to shift, in some quarters, after the Second Amendment was adopted. By the Nineteenth Century, some state courts — without examining the original history — concluded that the Second Amendment protects a right to carry weapons in public, so long as they were carried in plain view. *See, e.g.*, *State v. Chandler*, 1850 WL 3838, *2 (1850) (dicta); *Nunn v. State*, 1 Ga. 243, 251 (1846).

Of course, this trend was far from universal; other Nineteenth Century jurisdictions maintained the Framing-era approach that restricted or banned weapons in public. *See* Part II.B.1 *supra* (collecting statutes and cases). Because Constitutional rights are "enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. 634-35, any later, state-court misunderstandings of the Second

Amendment are immaterial, *see id.* at 624 n.24 (lower courts' "erroneous reliance upon an uncontested and virtually unreasoned case cannot nullify the reliance of millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms").

*Ezell* would give these later misconceptions constitutional significance. For *Ezell*, after incorrectly focusing the historical lens on the Nineteenth Century, instructs that "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically protected," then the activity is within the scope of the Second Amendment. Slip op. at 33. Given the inconclusive nature of the historical record in the Nineteenth Century, defendants cannot show that carrying weapons *openly* for self-defense outside the home was considered "conclusively" outside the scope of the right to bear arms at the time of the ratification of the Fourteenth Amendment. Because a proper historical analysis, grounded in the original understanding of the Second Amendment, yields a different result, the complaint should be dismissed on this ground as well.

### III.  Plaintiffs are not entitled to the injunctive relief sought

Plaintiffs claim two provisions of the Criminal Code violate the Second Amendment. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "[A] successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*." *Ezell* at 23 (emphasis in original). Here, however, plaintiffs attempt to avoid the impediments to facial challenges by pleading their claim as an "as applied" attack on the

statutes. Yet plaintiffs' challenge must fail, because their' broad "as applied" challenge asks the Court to strike down applications of the statutes that unquestionably fall within the legitimate regulatory power of the State.

In recognizing a Second Amendment right to possess firearms in the home for self defense, the Supreme Court made clear there are circumstances in which the statutes challenged by plaintiffs may lawfully be applied. *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). The *Heller* Court noted that the right to bear arms is not unlimited: "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapons whatsoever in any manner whatsoever, and for whatever purpose." *Id.* By way of example, the Court noted that the majority of Nineteenth Century courts to consider the question held that States may lawfully ban the carrying of concealed weapons and stated:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. 554 U.S. at 626.

The Seventh Circuit relied upon these examples to hold that felons, those convicted of misdemeanor crimes involving domestic violence, and habitual users of marijuana and other illegal drugs may lawfully be prohibited from possessing firearms. *Skoien*, 614 F.3d 638; *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010); *United States v. Davis*, 406 Fed. Appx. 52 (7th Cir. 2010). Because, as the Seventh Circuit has held, felons, habitual drug users, and those convicted of misdemeanor domestic battery have no Second Amendment right to bear arms, the laws in question may constitutionally be applied to those persons.

Relying on *Heller*, federal courts of appeals also have upheld laws prohibiting firearm possession in a national park, *Masciandaro,* 638 F.3d 408, on United States Postal Service property, *Derosan*, 350 Fed.Appx. 874 (5th Cir. 2009), and on an airplane. *U.S. v. Davis*, 304 Fed. Appx. 473 (9th Cir. 2008). Likewise, United States District Courts have upheld laws prohibiting firearm possession within 1000 feet of a school, *Hall v. Garcia*, 2011 WL 995933 (N.D. Cal. 2011); *U.S. v. Lewis*, 2008 WL 5412613 (D.V.I. 2008), and in a house of worship, *GeorgiaCarry.Org v. Georgia*, 764 F.Supp.2d 1306 (M.D. Ga. 2011).

*Heller* also made clear that the government may ban the possession of weapons that were not in common use at the time of the Second Amendment' enactment. *Heller*, 554 U.S. at 627. Thus, the cited statutes may lawfully be applied to the possession of machine guns, for example. *U.S. v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008).

Because the challenged statutes are unquestionably valid as applied to certain persons, locations, and weapons, plaintiffs are not entitled to the relief sought. Plaintiffs' complaint should, therefore, be dismissed.

**IV.    Summary**

Plaintiffs' complaint should be dismissed because plaintiffs are asking the Court to extend the Second Amendment far beyond the core right found in *Heller*. This extension is not mandated by *Heller* and is inconsistent with the historical record of restrictions on gun ownership. Because plaintiffs are claiming a right far beyond the core right announced in *Heller*, the statutes need only satisfy an intermediate level of scrutiny. The statutes in question serve important government objectives of protecting law enforcement officers and the general public through a reduction in the ready availability of loaded handguns on the

streets of urban areas. The legislature was justified in determining that the statutes advanced these interests.

Furthermore, plaintiffs are not entitled to the relief sought in this case. They ask for an injunction that would strike down applications of the statutes that are unquestionably within the State's legitimate police power.

Respectfully submitted,

LISA MADIGAN, in her official capacity as Attorney General of the State of Illinois, a n d HIRAM GRAU, in his official capacity as Director of the Illinois State Police,

Defendants,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendants.

s/Terence J. Corrigan
Terence J. Corrigan, #6191237
David A. Simpson, #6300876
Assistant Attorneys General
Attorney for Defendants
Office of the Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 782-5819
Facsimile:  (217) 524-5091
tcorrigan@atg.state.il.us

**Certificate of Service**

I hereby certify that on July 27, 2011, I presented the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

dsigale@sigalelaw.com

David@djensenpllc.com

and I hereby certify that on July 27, 2011, I have mailed by United States Postal Service, the document to the following non-registered participant:

    None

Respectfully submitted,

s/Terence J. Corrigan
Terence J. Corrigan, #6191237
David A. Simpson, #6300876
Assistant Attorney General
Attorney for Defendants
Office of the Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 782-5819
Facsimile:  (217) 524-5091
E-mail:tcorrigan@atg.state.il.us