**E-FILED**
Wednesday, 27 July, 2011  04:54:18 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

MICHAEL MOORE; CHARLES HOOKS;           )
PEGGY FECHTER; JON MAIER; SECOND        )
AMENDMENT FOUNDATION, INC.; and         )
ILLINOIS CARRY,                         )
                                        )
    Plaintiffs,                         )
                                        )
    -vs-                                )        No. 11-3134
                                        )
LISA MADIGAN, in her Official Capacity as   )
Attorney General of the State of Illinois; and   )
HIRAM GRAU, in his Official Capacity as     )
Director of the Illinois State Police,      )
                                        )
    Defendants.                         )

## RESPONSE TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

      Now come defendants, Lisa Madigan, Attorney General of the State of Illinois, and

Hiram Grau, Director of the Illinois State Police, by their attorney, Lisa Madigan, Attorney

General of the State of Illinois, and hereby respond to plaintiffs' motion for a preliminary

injunction, stating:

**I. Background**

      Plaintiffs claim that §24-1 and §24-1.6 of the Criminal Code (720 ILCS 5/24-1 and

5/24-1.6) are unconstitutional to the extent that they "prohibit otherwise qualified private

citizens from carrying handguns for self-defense." The first provision challenged by

plaintiffs, Section 24-1 of the Criminal Code,  provides, *inter alia*, that, subject to an

extensive list of exemptions in Section 24-2, a person cannot carry a weapon concealed

on his person, in a city, or in a vehicle, except when on that person's property or fixed

place of business or on the property of another with that person's permission.  The section

also prohibits possession or sale of fully automatic weapons; sawed-off shotguns; carrying

weapons while hooded, robed, or masked to conceal ones identity; and carrying weapons in government buildings. The second challenged provision creates the offense of aggravated unlawful use of a weapon and, subject to exceptions in section 24-2, applies when aggravating factors are present such as when the weapon is uncased, loaded, and immediately accessible; the offender is committing certain drug crimes; the offender is threatening violence against another; the offender has had an order of protection taken out against him or her; or the offender is under 21 and the weapon is a handgun.

## II.  Introduction

In arguing that they have a constitutional right to carry weapons, plaintiffs assert that "Illinois is the only State in the United States that completely prohibits its citizens from carrying firearms in public." *See* Motion for Preliminary Injunction, ¶ 2.  This statement is neither true nor relevant.  The Criminal Code does not completely prohibit citizens from carrying firearms in public.  More importantly, as set out *infra*, the Second Amendment must be interpreted by reference to the historical record, up to passage of the Fourteenth Amendment, without regard to the States' contemporary policy choices.  Viewed from its proper historical perspective, the possession of firearms in public is not a "core" Second Amendment right and, accordingly, is subject to intermediate scrutiny.  The statutes enacted by the Illinois General Assembly serve an important governmental interest and withstand this scrutiny.

## III.   Plaintiffs Are Not Entitled To a Preliminary Injunction

A party seeking a preliminary injunction must demonstrate that (1) it has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if a preliminary injunction is denied; (4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm

the public interest.  *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007).  If a plaintiff meets the threshold requirements for an injunction, the court must weigh the various factors "to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied."  *Coronado v. Valleyview Public School District*, 537 F.3d 791, 795 (7th Cir. 2008).

### A.     Plaintiffs have not demonstrated a likelihood of success on the merits

Judicial review under the Second Amendment proceeds in two steps.  First, the court must determine whether the activity at issue falls within the Second Amendment's "scope."  *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511, *12 (7th Cir. July 6, 2011).  This requires "a textual and historical inquiry into original meaning" to determine whether the restricted activity is "protected by the Second Amendment in the first place." *Id.*  "[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment — 1791 [for federal regulations] or 1868 [for State regulations] — then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."  *Id.*  "If the government cannot establish this" because "the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," then the court moves to the second step in the analysis: applying means-ends scrutiny.  *Id.* at *13.

Here, historical evidence shows there is no "core" Second Amendment right to carry weapons in public for personal self-defense.  Thus, the challenged statutes should receive, at most, intermediate scrutiny.[1]   Because the statutes are substantially related to the

---

[1] As explained in defendants' Motion to Dismiss, defendants also preserve for later review the argument that the challenged statutes are constitutional because they regulate

critical governmental interest of preventing armed violence, they are constitutional.

## 1.    Intermediate Scrutiny Applies Because the "Core" Of the Second Amendment Right Does Not Extend Outside Of The Home

*Ezell* holds that the level of scrutiny a firearms law receives depends "on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  2011 WL 2623511, at *13.  Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), "the core component" of the Second Amendment is "the right to possess operable firearms — handguns included — for self-defense, most notably in the home." *Id.* at *1.  "What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]."  *Skoien*, 614 F.3d at 640.  *Ezell* does not indicate what tests should be used to determine whether an activity is "core."  Indeed, the court in *Ezell* had no need to do so, for the plaintiffs there asserted only their "core Second Amendment right to possess firearms at home for protection."[2]  2011 WL 2623511, at *9.

The choice of test does not matter here.  Under any test, the right to carry firearms for personal self-defense outside the home — openly or concealed — is not "core."  In *Heller*, the Supreme Court held that the Second Amendment protects the right to possess a handgun for self-defense in the home.  554 U.S. at 635.  The Supreme Court limited this holding, cautioning that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation," *Heller*, 554 U.S. at 595*,* and the Court has never held that the Second Amendment guarantees a right to carry weapons for personal self-

---

conduct wholly outside the Second Amendment's scope.

[2] The *Ezell* court made passing reference to "the core right to possess firearms for self-defense."  2011 WL 2623511, at *17.  But this appears to be shorthand for the right to possess firearms for self-defense *in the home* — the right at issue in that case and the one discussed throughout the rest of the opinion.  *See, e.g.*, *id.* at *1, 7, 9, 11, 13-14.

defense outside the home.  Even if the Second Amendment does apply to places outside the home, courts "have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions."  *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Without support from *Heller*, this Court should not expand the right recognized there beyond the home.  When courts stretch *Heller* beyond its holding, they "circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee."  *Masciandaro*, 638 F.3d at 475.  Removing a vital issue of public safety from the democratic process "is serious business," *id.*, and should not be done lightly.  The costs of miscalculation are high.  "[N]o one doubts that the goal" of gun control laws, *i.e.*, "preventing armed mayhem, is an important governmental objective." *Skoien*, 614 F.3d at 642; *see also United States. v. Salerno*, 481 U.S. 739, 748 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.").  "If ever there was an occasion for restraint, this would seem to be it."  *Masciandaro*, 638 F.3d at 476.

In light of these concerns, courts nationwide have declined to extend the Second Amendment's protections beyond the home.  *See, e.g.*, *id.* at 475 ("On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself."); *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly."); *People v. Dawson*, 934 N.E.2d 598, 605-07 (Ill. App. Ct. 2010) (declining to extend Second Amendment outside of home because Supreme Court "deliberately and expressly maintained a controlled pace of essentially beginning to define this constitutional right"); *cf. People v. Yarbrough*, 169 Cal.App.4th 303, 312-14 (2008) (upholding California's

concealed weapons law because it did not implicate *Heller*'s core holding regarding weapons in the home); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (rejecting Second Amendment claim, under plain error review, because Supreme Court has not held that Second Amendment extends outside the home).  One court concluded, "We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475.  For these reasons alone, this Court should not announce a new "core" right to possess firearms for self-defense outside the home.

These are not the only reasons.  History also indicates that there is no "core" Second Amendment right to carry firearms for personal defense in public places.  *Heller* grounded its holding, in part, on the fact that "[f]ew laws in the history of our Nation have come close to the severe restriction" that the District of Columbia placed on guns in the home.  554 U.S. at 629.  Such is not the case here.  State and local governments frequently restricted citizens from carrying firearms in public when the Fourteenth Amendment was ratified.  *See, e.g.*, Act of Nov. 18, 1858, Corp. Laws of the City of Washington D.C., at 114 ("it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as a dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington") (Robert A. Waters 1853 & 1860); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding "ope[n]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); Tex. Act of Apr. 12, 1871, ch. 34 (prohibiting carrying of pistols without "immediate and pressing" reasonable grounds to fear "immediate and pressing" attack or for militia service); *accord Aymette v. State*, 1840 WL 1554, *4 (Tenn. 1840) ("The Legislature, therefore, have a right to prohibit the wearing or

keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 1842 WL 331, *5 (Ark. 1842). Such laws cannot be squared with a recognized, inalienable right to carry firearms in public at the time.

The history at the time of the Second Amendment's ratification is even clearer on the point. "[T]he Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," *Heller*, 554 U.S. at 599 (internal quotations omitted), and "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" at English law, *id.* at 592 (emphasis in original). Thus, if history indicates that English law did not consider an activity to be a "core" right, then that activity cannot be within the Second Amendment's core protections.

History demonstrates that neither English statutory nor common law provided any right to carry weapons in public. For nearly seven hundred years, England criminalized the practice. The Statute of Northampton, one of the earliest laws regulating weapons possession, provided that, unless he was on the King's business, no man was permitted to "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). English courts upheld the continuing vitality of this law, even hundreds of years later. In *Sir John Knight's Case*, 87 Eng. Rep. 75 (1686), for example, the Chief Justice noted that carrying arms in public was not merely banned by the Statute of Northampton, but was "likewise a great offence at the common law." *Id.* The reason was not just that carrying arms in public was dangerous, but also that it was an insult to the

sovereign and the social compact: "as if the King were not able or willing to protect his subjects." *Id.* In this way, the Statue of Northampton was "but an affirmance" of the longstanding common law rule that there is no right to carry weapons in public. *Id.* The Statute remained the law of Massachusetts, North Carolina, and Virginia, nearly verbatim, even after the ratification of the Constitution, *see* Patrick J. Charles, *Scribble Scrabble, The Second Amendment, & Historical Guideposts: A Short Reply to Lawrence Rosenthal & Joyce Lee Malcolm*, 105 Nw. U. L. Rev. Colloquy 227, 237 (2011), laws that would have been unthinkable if there were a widely understood right carry to arms for self-defense in public at the time.

The most prominent common law scholars agreed that there was no right to carry arms outside the home. Lord Edward Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593-94 (1980) (internal markings omitted), confirmed — in a chapter entitled "Against going or riding armed," *see* 3 Coke, Institutes of the Laws of England 160 (1797 ed.) — that English law forbade carrying weapons in public. Under the Statute of Northampton, Coke explained, one could possess weapons in the home "to keep his house against those that come to rob, or kill him, or to offer him violence in it." *Id.* "But he cannot assemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place." *Id.* at 162. That the weapons were carried for self-defense was no excuse under the Statute. *Id.* Indeed, even an immediate threat of harm did not permit one to go armed in public spaces. *Id.*

William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (internal quotations omitted), confirmed there was no right to carry weapons in public for personal defense. "The offence

8

of riding or going armed with dangerous or unusual weapons," he wrote, "is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the [Statute of Northampton], upon pain of forfeiture of the arms and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."  Commentaries *149.

In short, English law acknowledged a right to use arms to defend one's home — the "core" right recognized in *Heller*.  *See* 3 Coke, Institutes at 160.  It did not recognize any right to carry weapons in public for personal self-defense.  On the contrary, English statutes and common law forbade the practice.  Accordingly, carrying a weapon in public for personal self-defense cannot be a "core" Second Amendment right.  Thus, to the extent that carrying firearms outside the home for personal self-defense implicates the Second Amendment at all (and history proves that it does not), it certainly lies "closer to the margins of the Second Amendment right," and therefore "may be more easily justified" under means-ends analysis.  *Ezell*, 2011 WL 2623511, at *17.  As a result, the proper standard for evaluating plaintiffs' constitutional claim is intermediate scrutiny.

### 2.   Plaintiffs' Arguments That The "Core" Of The Second Amendment Extends To Personal Self-Defense Outside The Home Are Unpersuasive And Historically Unsupported

None of plaintiffs' arguments to the contrary withstand scrutiny.  Plaintiffs offer no relevant historical support for their view that there is a "core" Second Amendment right to carry firearms for self-defense in public, and their remaining arguments rest on strained and ultimately unsupportable readings of *Heller*.

The most significant deficiency in plaintiffs' argument is its lack of proper historical analysis.  As discussed, "the Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," *Heller*, 554 U.S.

at 599  (internal quotations omitted).  Thus, any understanding of the Second Amendment must start with an analysis of the English right.  But plaintiffs do not even attempt to do this. They do not cite a single English source in their brief; indeed, they do not cite *any* historical source written before 1846.  Thus, they offer no persuasive account of how the English right codified in the Second Amendment could include a "core" right to carry firearms in public places for self-defense.

Instead, plaintiffs cite a handful of mid-Nineteenth Century state cases that concluded, without examining its original history, that the Second Amendment protects a right to carry weapons in public so long as they are carried in plain view.  Doc. 14 at 14; *see, e.g.*, *State v. Chandler*, 1850 WL 3838, *2 (1850) (dicta); *Nunn v. State*, 1 Ga. 243, 251 (1846).  But this post-ratification historical trend was nowhere near as universal as plaintiffs make it out to be; other Nineteenth Century jurisdictions maintained the Framing-era approach that restricted or banned weapons in public.  *See* Part II.A, *supra* (collecting statutes and cases).  And more fundamentally, this later trend is simply irrelevant.  The Second Amendment did not create a new right, but rather "codified a right inherited from our English ancestors."  *Heller*, 554 U.S. at 599 (internal quotations omitted).  Because constitutional rights are "enshrined with the scope they were understood to have when the people adopted them," *id.* at 634-35, any later, state-court misunderstandings of the Second Amendment are immaterial, *see id.* at 624 n.24 (lower courts' "erroneous reliance upon an uncontested and virtually unreasoned case cannot nullify the reliance of millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms").  Nothing in the Nineteenth Century changed — or could change — the scope of the preexisting English right that the Framers adopted in the Second Amendment.

Next, plaintiffs observe that the Second Amendment contains a right to "bear" arms, and that, under *Heller*, "bear" means "carry." Doc. 14 at 11-14. Thus, plaintiffs reason, they must have a right to "carry" firearms wherever they like. A contrary understanding, they contend, would read the term "bear" out of the Second Amendment.

Plaintiffs' contention fails. *Heller* is clear that the Second Amendment confers a right to "carry" arms, 554 U.S. at 584, but it is equally clear that this right is limited; the Amendment does not protect "the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595 (emphasis in original). Thus, plaintiffs' claim that they should be able to carry arms in public for personal self-defense because they have a right to "carry" arms merely begs the question. The issue here is not whether plaintiffs have a right to "carry" arms; it is whether plaintiffs have a "core" right to "carry" arms in the manner, times, and places that they prefer. As shown above, the Second Amendment's original understanding was that they do not have such a core right, and that settles the constitutional question.

In any event, Illinois does not stop plaintiffs from "bearing" arms now. Nothing in Illinois law prevents people from "carrying" arms in their home; on their own land; in their fixed place of business; in someone else's home (with their permission); on someone else's land (with their permission); in any land outside "the corporate limits of a city, village or incorporated town"; in designated hunting areas; and during militia service. *See* 720 ILCS 5/24-1, *et seq.* (West 2011); 520 ILCS 5/1.1, *et seq.* (West 2011) (Illinois Wildlife Code); 17 Ill. Adm. Code 510, *et seq.* (West 2011). Accordingly, Illinois' current statutory scheme aligns with the Second Amendment's text as well as its history.

Finally, plaintiffs rely on the fact that *Heller* Court includes a list of "'presumptively lawful'" restrictions on gun use. Doc. 14 at 13 (quoting *Heller*, 554 U.S. at 626 n.26). This

list, plaintiffs conclude, "implicitly recognizes a *general* right to carry guns" because the Court would have had no reason to make the list "if it had thought it was *not* recognizing a general right to carry guns." Doc. 14 at 13. In other words, *Heller*'s explicit limitation of its holding was really an implicit *expansion* of its holding.

*Heller* does not support this strained reading. "[S]ince this case represents this Court's first in-depth examination of the Second Amendment," the *Heller* court wrote, "one should not expect it to clarify the entire field." 554 U.S. at 635. Thus, while *Heller* did provide a list of "presumptively lawful" regulations, it cautioned that these were only "examples" and that "our list does not purport to be exhaustive." *Id.* at 626 n.26. In so doing, the Court "warn[ed] readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open." *Skoien*, 614 F.3d at 640. As a result, plaintiffs' reading simply cannot carry the day.

In sum, the Second Amendment codified a preexisting English right to possess weapons, and that English right did not include a privilege to carry firearms in public for self-defense. Plaintiffs' arguments to the contrary are unavailing, for they rely only on selective readings of *Heller* and of the wrong period in American history. Accordingly, there is no "core" right to carry firearms for personal self-defense in public, and the proper standard for evaluating plaintiffs' constitutional claim is intermediate scrutiny.

### 3. The Challenged Statutes Satisfy Intermediate Scrutiny

To satisfy intermediate scrutiny, a law must be "substantially related to an important government objective." *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Illinois' prohibition against the carrying of loaded — and readily loadable — firearms in public

places readily satisfies this standard.  The State's interest in protecting the public health and safety has long been recognized as a compelling objective for purposes of constitutional scrutiny, *see Salerno*, 481 U.S. at 750, 754-55, and "no one doubts" that "preventing armed mayhem . . . is an important governmental objective," *Skoien*, 614 F.3d at 642.

The challenged provisions are substantially related to this compelling interest in public safety.  The "benefits" of a firearm regulation need not be "established with admissible evidence," for a court may also look to "logic" in deciding whether a "substantial relation" exists between the regulation and its objective.  *Skoien*, 614 F.3d at 641-42; *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (speech regulations may be upheld against First Amendment challenges "based solely on history, consensus, and 'simply common sense'").  Logic supports the notion that the provisions that plaintiffs challenge will make it more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, either purposefully or accidently.  Even if empirical evidence were necessary (which it is not), it, too, supports the statutes' common-sense goals: Preliminary studies indicate that the passage of so-called "right to carry" laws in other States corresponds with a measurable increase in crime.  *See* John J. Donohue, *Guns, Crime, & the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623, 630-39 (2004).  Evidence from other States also suggests that permitting systems consistently fail to keep guns out of the hands of dangerous people.  *See, e.g.*, Violence Policy Center, *Concealed Carry Killers* (2009), *available at* http://www.vpc.org/ccwkillers.htm (concealed carry permit-holders have killed 309 people, including 11 police officers, since May 2007).

In sum, the challenged statutes serve an important government interest in ensuring public safety, and they further that interest by reasonable means supported by logic and

empirical evidence.  Accordingly, the open and concealed-carry bans satisfy intermediate scrutiny.

### 4.      Plaintiffs are not entitled to the injunction sought

Plaintiffs seek an injunction prohibiting enforcement of provisions of the Criminal Code as to persons otherwise qualified to possess firearms.  The other persons mentioned in the motion are not parties to this case, however, and "district courts lack the authority to enjoin the 'enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" *Wisconsin Right to Life, Incorporated v. Schober*, 366 F.3d 485,490 (7th Cir 2004), *quoting McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir 1997). The Court, therefore, cannot grant the relief sought.

Furthermore, even if there were a constitutional right to carry firearms in public for self-defense, the relief sought would  intrude impermissibly into the lawful police powers of the State. Plaintiffs are seeking relief that would eliminate all restrictions on the ability of Illinois to regulate firearm possession in "public," except the requirement that citizens possess Firearms Owners Identification cards ("FOID cards").   Thus, the plaintiffs are asking the Court to strike down all provisions of these statutes that are inconsistent with the claimed right to carry handguns in public.

In recognizing a Second Amendment right to possess firearms in the home for self-defense, however, the Supreme Court made clear there are circumstances in which the statutes challenged by plaintiffs may lawfully be applied.  *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).  The *Heller* Court noted that the right to bear arms is not unlimited: "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapons whatsoever in any manner whatsoever, and for whatever purpose." *Id.*  By way of

example, the Court noted that the majority of 19th century courts to consider the question

held that States may lawfully ban the carrying of concealed weapons and stated:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.  554 U.S. at 626.

The Seventh Circuit relied upon these examples to hold that felons, those convicted

of misdemeanor crimes involving domestic violence, and habitual users of marijuana and

other illegal drugs may lawfully be prohibited from possessing firearms. . *Skoien*, 614 F.3d

638; *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Yancey*, 621

F.3d 681 (7th Cir. 2010); *United States v. Davis*, 406 Fed. Appx. 52 (7th Cir. 2010).

Because, as the Seventh Circuit has held, felons, habitual drug users, and those convicted

of misdemeanor domestic battery have no Second Amendment right to bear arms, the laws

in question may constitutionally be applied to those persons.  The State of Illinois, however,

has chosen in some circumstances to allow convicted felons to obtain FOID cards.  *See*

Hosteny and Coffman affidavits.  While the State may have deemed these persons

sufficiently rehabilitated to possess weapons in the home or for hunting, the State has the

authority to limit their right to possess weapons in other places and for other purposes.

Furthermore, while the legislature, weighing costs and benefits, has determined that more

extensive background checks and training requirements are unnecessary when weapons

are possessed in the home or for hunting, it could determine that such requirements are

necessary before persons lawfully carry loaded weapons in city streets.  While plaintiffs do

not appear to challenge such restrictions (*see* plaintiffs' memo, p. 1), plaintiffs seek an

injunction that would eliminate any such restrictions.

Furthermore, plaintiffs would have the Court remove any restriction on the types of

public place where weapons could be regulated.  However, relying on *Heller*, federal courts of appeals also have upheld laws prohibiting firearm possession in a national park, *Masciandaro,* 638 F.3d 408; on United States Postal Service property, *Derosan*, 350 Fed.Appx. 874 (5th Cir. 2009); and on an airplane, *U.S. v. Davis*, 304 Fed. Appx. 473 (9th Cir. 2008).  Likewise, United States District Courts have upheld laws prohibiting firearm possession within 1000 feet of a school, *Hall v. Garcia*, 2011 WL 995933 (N.D. Cal. 2011); *U.S. v. Lewis*, 2008 WL 5412613 (D.V.I. 2008), and in a house of worship, *GeorgiaCarry.Org v. Georgia*, 764 F.Supp.2d 1306 (M.D. Ga. 2011).

Heller* also made clear that the government may ban the possession of weapons that were not in common use at the time of enactment of the Second Amendment.  *Heller*, 554 U.S. at 627.  Thus, the cited statutes may lawfully be applied to the possession of machine guns, for example.  *U.S. v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008).  In contrast, plaintiffs ask this Court to remove restrictions on fully automatic handguns and sawed-off shotguns (so long as the gun was shortened to the point it qualified as a handgun).

Furthermore, plaintiffs equate possession of a FOID card with being legally qualified to possess weapons.  Due to imperfections in the system, however, the possession of a FOID card does not mean that one is entitled to carry a weapon. *See* Coffman affidavit.

The plaintiffs are therefore not entitled to the broad relief sought, even if the Court were to recognize a Second Amendment right to carry weapons in public.

### C.    Plaintiffs have not demonstrated they would suffer irreparable harm

None of the plaintiffs claim that they personally will suffer irreparable harm if a preliminary injunction does not issue. Plaintiffs claim that they do not need to prove irreparable harm, because such harm is presumed, citing *Ezell*, 2011 WL 2623511 at 10.

*Ezell*, however, involved an ordinance that impinged upon the right to possess firearms in defense of the home, a constitutional right recognized in *Heller*.  *Ezell*, 2011 WL 2623511 at 14.  Thus, while a question might remain as to whether the right at issue there had been infringed, the right itself had been recognized.  In contrast, here, plaintiffs are claiming that irreparable harm should be presumed from the "violation" of a constitutional right which has never been recognized.

Furthermore, in *Ezell*, the court was faced with a facial challenge to the statute and individual harm was, therefore, irrelevant.  *Id.* at 9-10.  Here, plaintiffs have brought an "as applied" challenge.  Individual harm is not, therefore, irrelevant.

The Court should find, accordingly, that plaintiffs have failed to prove that they will suffer irreparable harm if injunctive relief is denied.

### D.    The injunctive relief sought will harm the public interest[3]

Plaintiffs ask this Court to enjoin enforcement of public safety measures determined by the Illinois General Assembly to be in the public interest as a means of protecting the safety and welfare of the people of the State.  Instead, plaintiffs propose a vague injunction that would allow all persons "qualified to possess firearms in Illinois" to carry firearms in public.  Assuming that "qualified to possess" means possessing a FOID card (as suggested by plaintiffs' complaint), plaintiffs' requested injunction would permit the carrying of any firearm by any person who possessed a FOID card without regard to the cardholder's training or intent to use the weapon for crimes of violence, without regard to whether the person was intoxicated, and without limitation as to the nature of the public place. Thus, the State would be compelled to allow weapons to be carried into courthouses; government

---

[3]While weighing the harm that defendants will suffer is a separate element, in the context of this case the harm that the State as an entity will suffer and the public interest largely merge.

offices; churches; schools; and public businesses, including bars and banks. In short, the requested injunctive relief would extend into areas the *Heller* court acknowledged are constitutionally subject to state regulation.

There have been numerous attempts to quantify the impacts of gun regulation, and the lack of any consensus demonstrates why gun control is best left to the legislature.  The empirical studies are numerous.  One camp of researchers has argued that arming citizens will reduce crime, *see, e.g.*, John R. Lott Jr*., More Guns, Less Crime: Understanding Crime & Gun Control Laws* (Univ. Chicago Pr. 2000), while another camp suggests that Lott's research was flawed and that concealed carry laws either have no impact or make violence more likely, *see, e.g.*, Robert Ehrlich, *Nine Crazy Ideas in Science (A Few May Even Be True*) (Princeton Univ. Pr. 2001).  Ehrlich and Lott debated their competing research and conclusions in *The Great Gun Fight*, Reason 53 (Aug. 2001).

A study in the American Journal of Public Health recently concluded that "guns did not protect those who possessed them from being shot in an assault."  Branas, et al., *Investigating the Link Between Gun Possession & Gun Assault*, 99 Am. J. Pub. Health 2034 (2009).  The research demonstrated that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault."  *Id.* at 2037.  Using a more holistic approach, another group of researchers identified a significant decrease in the number of gun-related deaths in jurisdictions with comprehensive gun control legislation.  Ik-Whan Kwon & Daniel Baack, *The Effectiveness of Legislation Controlling Gun Usage*, 64 Am. J. Econ. & Soc. 533 (2005).

The competing nature of these studies demonstrates that plaintiffs have not, and cannot, meet their burden of showing that a preliminary injunction will not harm the public interest.  Plaintiffs insist that they are seeking relief on behalf of "law abiding citizens," A

term presumably meant to include all who have not yet been convicted of a crime.  Every murderer, robber, and rapist fell within that definition at some point in their lives.  It is because dangerous weapons are at issue and the public interest is at risk that the Fourth Circuit noted it did not want to be responsible "for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."  *Masciandaro,* 638 F.3d at 475 (noting that the "danger would rise exponentially" if the right to carry weapons moved from the home to the public square).  The Seventh Circuit has also noted the danger to the public interest in the type of relief sought in this case: "Erroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc."  *Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir 2004).

None of these studies contradict a common sense principle: reducing the number of people who possess guns in populated areas reduces the chance that a firearm will be discharged in a populated area.  This is the key fit between the legislation at issue in this case and the government's overwhelming interest in insuring public safety. Weighing the competing studies was a matter for the legislature.  It has enacted statutes that, in the collective opinion of that body, best serve the important state interest in reducing gun-related violence and other gun-related crimes.  The collective wisdom of the legislature should not be set aside on the incomplete record of a preliminary injunction proceeding.

## IV.   The Preliminary Injunction Hearing and Trial on the Merits Should Not Be Consolidated

Claiming that there are no fact issues which require evidence, plaintiffs have asked the Court to consolidate trial on the merits with the preliminary injunction hearing. Defendants have moved to dismiss plaintiffs' complaint, asserting that intermediate scrutiny should be applied and the provisions of the Criminal Code may be upheld without the Court hearing evidence.  Defendants, thus, agree that judgment could be entered in defendants'

favor without evidence.  Defendants disagree, however, with the contention that the Court could rule in plaintiffs' favor without hearing evidence, either through a trial, or motion for summary judgment under Rule 56.

If the Court finds that intermediate scrutiny is appropriate, the motion to dismiss should be granted, as the challenged provisions satisfy this standard.  If, however, the Court were to disagree and find that a higher level of scrutiny needs to be applied, the Court does need evidence to decide the question.  The Seventh Circuit has held that when a regulation impinges on a "core" Second Amendment interest, the defendant needs to justify the regulation with data and expert opinion.  *Ezell v. City of Chicago*, __ F.3d __, 2011 WL 2623511 at 17 (7th Cir. 2011).

Thus, pursuant to Rule 26 of the Federal Rules of Civil Procedure, defendants are entitled to know in advance the opinions plaintiffs might intend to offer.  Defendants need time to gather data and secure their own experts, which must also be disclosed under Rule 26.   The Court should not strike down the laws enacted by the General Assembly for the protection of Illinois citizens without a full record.  Accordingly, once the Court has ruled on defendants' motion to dismiss, if the case  remains pending, a scheduling order should be entered in accordance with Rule 16.2 of the United States District Court for the Central District of Illinois.

## V.    Conclusion

Plaintiffs seek injunctive relief that would apply to nonparties and is beyond the authority of the Court.  In urging this Court to find a core right to carry weapons in public, plaintiffs have misread the historical record.  Plaintiffs have not shown that the statutes fail intermediate scrutiny.  Plaintiffs have also not demonstrated irreparable harm.  Because of this and because the requested injunction will harm the public interest, the motion

should be denied.

WHEREFORE, defendants respectfully request that this honorable Court deny plaintiffs' motion for a preliminary injunction and further deny plaintiffs' request to consolidate the hearing on the preliminary injunction with trial on the merits.

Respectfully submitted,

LISA MADIGAN, et al.,

Defendants,

Terence J. Corrigan, #6191237          LISA MADIGAN, Attorney General
David A. Simpson, #6300876             State of Illinois,
Assistant Attorneys General
500 South Second Street                       Attorney for Defendants.
Springfield, IL  62706
Telephone:  (217) 782-5819             By: /s/Terence J. Corrigan_____
Facsimile:  (217) 524-5091                   Terence J. Corrigan
tcorrigan@atg.state.il.us                       Assistant Attorney General

21

**Certificate of Service**

I hereby certify that on July 27, 2011, I presented the foregoing Defendants' Response to Plaintiffs' Motion for Preliminary Injunction to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

dsigale@sigalelaw.com

david@djensenpllc.com

and I hereby certify that on July 27, 2011, I have mailed by United States Postal Service, the document to the following non-registered participant:

None

Respectfully submitted,

s/Terence J. Corrigan
Terence J. Corrigan, #6191237
David A. Simpson, #6300876
Assistant Attorneys General
Attorney for Defendants
Office of the Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 782-5819
Facsimile:  (217) 524-5091
E-mail:tcorrigan@atg.state.il.us