**E-FILED**
Tuesday, 02 August, 2011  03:31:34 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

MICHAEL MOORE; CHARLES HOOKS;      )
PEGGY FECHTER; JON MAIER; SECOND   )
AMENDMENT FOUNDATION, INC.; and    )
ILLINOIS CARRY,                    )
                                   )      Case No. 3:11-cv-3134
            Plaintiffs,            )
            -against-              )
                                   )
LISA MADIGAN, in her Official Capacity as   )
Attorney General of the State of Illinois; and   )
HIRAM GRAU, in his Official Capacity as     )
Director of the Illinois State Police,      )
                                   )
            Defendants.            )

**BRIEF OF *AMICUS CURIAE* BRADY CENTER TO
PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS**

Robert J. Harris
Harris Winick LLP
333 West Wacker Drive
Suite 2060
Chicago, Illinois 60606

Jonathan L. Diesenhaus
S. Chartey Quarcoo
Matthew C. Sullivan
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, DC 20005

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...............................................................................................................1

INTEREST OF *AMICI* .......................................................................................................2

LEGAL BACKGROUND ....................................................................................................2

ARGUMENT.......................................................................................................................4

    I.      THE ILLINOIS UNLAWFUL USE OF WEAPONS STATUTES DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY ..........4

          A.    The Illinois Provisions at Issue Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*............5

          B.    The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public ......................................................................................................10

    II.     EVEN IF THE ILLINOIS STATUTORY SCHEME DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY ..........................13

          A.    The Reasonable Regulation Test is the Appropriate Standard of Review ........................................................................................................14

          B.    The Illinois Statutes at Issue Are Constitutional.......................................18

CONCLUSION...................................................................................................................19

# TABLE OF AUTHORITIES

Page

CASES:

Aymette v. State,
    21 Tenn. 154 (1840) ........................................................................... 9

Bleiler v. Chief, Dover Police Dep't,
    927 A.2d 1216 (N.H. 2007) ...............................................................15

Bliss v. Commonwealth,
    12 Ky. 90 (1822) .................................................................................9

Commonwealth v. Robinson,
    600 A.2d 957 (Pa. Super. Ct. 1991) ..................................................13

Commonwealth v. Romero,
    673 A.2d 374 (Pa. Super. Ct. 1996) ..................................................13

Dep't of Revenue of Ky. v. Davis,
    553 U.S. 328 (2008) ..........................................................................16

District of Columbia v. Heller,
    554 U.S. 570 (2008) .................................................................. passim

Dorr v. Weber,
    741 F. Supp. 2d 993 (N.D. Iowa 2010) ...............................................7

English v. State,
    35 Tex. 473 (1871) ..............................................................................9

Ex parte Thomas,
    97 P. 260 (Okla. 1908) ........................................................................9

Ezell v. Chicago,
    No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011) ............... passim

Fife v. State,
    31 Ark. 455 (1876) ..............................................................................9

Gonzales v. Oregon,
    546 U.S. 243 (2006) ..........................................................................17

Gonzalez v. Village of W. Milwaukee,
    No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010) ..............7

# TABLE OF AUTHORITIES—Continued

Page

*Heller v. District of Columbia*
     698 F. Supp. 2d 179 (D.D.C. 2010) ........................................................3, 4, 16, 18

*Hill v. State*,
     53 Ga. 472 (1874) ........................................................................................9

*In re Factor*,
     No. A-5202-08T4, 2010 WL 1753307 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ..................7

*Jackson v. State*,
     68 So.2d 850 (Ala. Ct. App. 1953) ................................................................15

*Kelley v. Johnson*,
     425 U.S. 238 (1976)....................................................................................17

*Kennedy v. Louisiana*,
     554 U.S. 407 (2008) ...................................................................................14

*Lebron v. Gottlieb Memorial Hosp.*,
     930 N.E.2d 895 (Ill. 2010) ..........................................................................8

*Mathews v. Eldridge*,
     424 U.S. 319 (1976)....................................................................................14

*McDonald v. City of Chicago*,
     130 S. Ct. 3020 (2010).......................................................................... *passim*

*People v. Aguilar*,
     944 N.E.2d 816 (Ill. App. Ct. 2011) ........................................................1, 6, 18

*People v. Dawson*,
     934 N.E.2d 598 (Ill. App. Ct. 2010) ........................................................1, 4, 5, 6

*People v. Flores*,
     169 Cal. App. 4th 568 (2008) ......................................................................19

*People v. Marin*,
     795 N.E.2d 953 (Ill. App. Ct. 2003) ........................................................8, 18

*People v. McGee*,
     794 N.E.2d 855 (Ill. App. Ct. 2003) ................................................................8

*People v. Mimes*,
     No. 1-08-2747, --- N.E.2d ---, 2011 WL 2507054 (Ill. App. Ct. 2011)..............................6, 18

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page</u>

*People v. Williams*,
  940 N.E.2d 95 (Ill. App. Ct. 2010) ...................................................................1, 6

*People v. Yarbrough*,
  169 Cal. App. 4th 303 (2008) ..............................................................................10

*Planned Parenthood v. Casey*,
  505 U.S. 833 (1992)..............................................................................................14

*Queenside Hills Realty Co. v. Saxl*,
  328 U.S. 80 (1946)................................................................................................16

*Quilici v. Village of Morton Grove*,
  532 F. Supp. 1169 (N.D. Ill. 1981) .......................................................................8

*Richards v. County of Yolo*,
  No. 2:09–cv–01235, 2011 WL 1885641 (E.D. Cal. May 16, 2011).......................7

*Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989)..............................................................................................17

*Riddick v. United States*,
  995 A.2d 212 (D.C. 2010) ......................................................................................7

*Robertson v. Baldwin*,
  165 U.S. 275 (1897)..........................................................................................1, 5

*Robertson v. City & County of Denver*,
  874 P.2d 325 (Colo. 1994)............................................................................14, 15

*Sims v. United States*,
  963 A.2d 147 (D.C. 2008) ......................................................................................7

*State v. Buzzard*,
  4 Ark. 18 (1842)......................................................................................................9

*State v. Cole*,
  665 N.W.2d 328 (Wis. 2003).................................................................................15

*State v. Comeau*,
  448 N.W.2d 595 (Neb. 1989).................................................................................15

*State v. Dawson*,
  159 S.E.2d 1 (N.C. 1968).......................................................................................15

## TABLE OF AUTHORITIES—Continued

Page

*State v. Hamdan*,
  665 N.W.2d 785 (Wis. 2002) .......................................................15

*State v. Jumel*,
  13 La. Ann. 399 (1858) ..............................................................9

*State v. Knight*,
  218 P.3d 1177 (Kan. Ct. App. 2009) ...........................................6

*State v. Sieyes*,
  225 P.3d 995 (Wash. 2010) ........................................................19

*State v. Workman*,
  14 S.E. 9 (W. Va. 1891) .............................................................9

*Teng v. Town of Kensington*,
  No. 09-cv-8-JL, 2010 WL 596526 (D.N.H. Feb. 17, 2010) ....................7

*Terry v. Ohio*,
  392 U.S. 1 (1968) .....................................................................14

*Trinen v. City & County of Denver*,
  53 P.3d 754 (Colo. Ct. App. 2002) ............................................15

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997) ..................................................................17

*United States v. Bledsoe*,
  No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) .................16, 18, 19

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ...................................................4, 16

*United States v. Engstrum*,
  609 F. Supp. 2d 1227 (D. Utah) .................................................19

*United States v. Hart*,
  725 F. Supp. 2d 56 (D. Mass. 2010) ...........................................7

*United States v. Hayes*,
  555 U.S. 415 (2009) ....................................................................3

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ......................................................4, 16, 18

## TABLE OF AUTHORITIES—Continued

Page

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) .................................................................7

*United States v. Masciandaro*,
    648 F. Supp. 2d 779 (E.D. Va. 2009) ...................................................19

*United States v. McCane*,
    573 F.3d 1037 (10th Cir. 2009) .............................................................19

*United States v. Miller*,
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009)........................... 16, 17, 18, 19

*United States v. Radencich*,
    No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009) ............................19

*United States v. Schultz*,
    No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) .............19

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) ..............................................................4, 8

*United States v. Tooley*,
    717 F. Supp. 2d 580 (S.D. W. Va. 2010)................................................7

*United States v. Walker*,
    380 A.2d 1388 (D.C. 1977) ..................................................................10

*United States v. Williams*,
    616 F.3d 685 (7th Cir. 2010) ................................................................15

*United States v. Yanez-Vasquez*,
    No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) .................................16, 19

*Williams v. State*,
    10 A.3d 1167 (Md. 2011) .......................................................................3

*Young v. American Mini Theatres, Inc.*,
    427 U.S 50 (1976)..................................................................................17

### STATUTES:

18 U.S.C. § 922(a)(6).................................................................................16

18 U.S.C. § 922(g)(1) ................................................................................ 16

<b><u>TABLE OF AUTHORITIES</u>—Continued</b>

<u>Page</u>

18 U.S.C. § 922(g)(5) ....................................................................................16

18 U.S.C. § 922(g)(9) ..........................................................................3, 8, 16

18 U.S.C. § 922(k) .........................................................................................16

720 ILCS 5/24-1 ..................................................................................... *passim*

720 ILCS 5/24-1.6 .................................................................................. *passim*

720 ILCS 5/24-2 ...............................................................................8, 16, 18

1876 Wyo. Comp. Laws ch. 52, § 1 ..............................................................8

Ark. Act of Apr. 1, 1881 ................................................................................9

Tex. Act of Apr. 12, 1871 ..............................................................................9

**CONSTITUTIONAL PROVISIONS:**

Ky. Const. of 1850, art. XIII, § 25 ................................................................9

U.S. Const., amend. I .................................................................................. 14

U.S. Const., amend. II................................................................................. *passim*

U.S. Const., amend. IV ............................................................................... 14

U.S. Const., amend. VIII............................................................................. 14

**OTHER AUTHORITIES:**

Adam Winkler, *Scrutinizing the Second Amendment*,
  105 MICH. L. REV. 683 (2007) ..............................................................14

Charles C. Branas, et al., *Investigating the Link Between Gun Possession
  and Gun Assault*, 99 AMER. J. PUB. HEALTH 1 (Nov. 2009)....................12

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive
  Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000)...............11

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*,
  34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) ......................................13

**TABLE OF AUTHORITIES—Continued**

Page

David McDowall, et al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995) ........................................12

ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND CONSTITUTIONAL RIGHTS (1904).................................................................................................................10

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009)...................15

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, THE ECON. OF GUN CONTROL 473 (May 1998)...........12

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 CENT. L.J. 259 (1874) ...............................................................................9

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) ..................................................11

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868).......................9

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004)..................................................................................12

John Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289 (2003)........................................................11

JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES (1868)...................................................................................................9

Lisa M. Hepburn, David Hemenway, *Firearm availability and homicide: A review of the literature*, 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004)..................................11

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001) ...............................11

Matthew Miller, et al., *Firearm availability and unintentional firearm deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000).........................................11

Matthew Miller, David Hemenway, Deborah Azrael, *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003*, SOCIAL SCIENCE & MEDICINE (2006) ..................................................11

Matthew Miller, et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997,* 92 AM J. PUBLIC HEALTH 1988 (Dec. 2002) .....................................................................................................................11

**TABLE OF AUTHORITIES**—Continued

Page

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*,
    J. Pub. Econ. 379 (2006) ...........................................................................13

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social
    Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009) .............................................12

Violence Policy Center, *Concealed Carry Killers* (2011) ...........................................11

**INTRODUCTION**

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.  554 U.S. 570 (2008).  Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.  While the Supreme Court held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, it never recognized a far broader right to carry guns in public places.  Nor did the Court overturn longstanding precedent that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).  On the contrary, *Heller* found restrictions on public carrying to be in line with permissible gun laws. *Heller*, 554 U.S. at 626-27.

Courts around the nation have refused to extend *Heller*'s limited holding beyond the home,[1] and Illinois courts have held that *Heller* bears no impact on the state's public gun carrying restrictions.  *See People v. Williams*, 940 N.E.2d 95 (Ill. App. Ct. 2010); *People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010); *see also People v. Aguilar*, 944 N.E.2d 816 (Ill. App. Ct. 2011).  The reluctance to expand *Heller* is well-founded.  In *Heller* and *McDonald v. City of Chicago*, the Court never announced a right to carry in public; it stated its holding as bound to the home. *See McDonald*, 130 S. Ct. 3020 (2010); *Heller*, 554 U.S. 570. Numerous courts, from those sitting in the 19th century to today, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns in public.  It would be unprecedented to now hold that the Constitution bars Illinois from choosing to keep loaded, accessible guns out of public places.  There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily activities, be subjected to the severe risks of gun carrying.

An extension of the Second Amendment to deny states the ability to regulate the public

---

[1] *See infra*, pp. 5-7.

carrying of guns would run counter to the "assurances" of *Heller* and *McDonald* that "reasonable firearms regulations" will remain permissible, and the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n.26. Illinois law governing the public carrying of weapons is precisely that reasonable regulation.

## INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving state and federal gun laws. *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## LEGAL BACKGROUND

Recent Supreme Court Jurisprudence:  In *Heller*, the Supreme Court held that the Second Amendment protects the narrow right of responsible, law-abiding citizens to possess a gun in the home for self-defense.  554 U.S. at 628-29.  While the Court could have stopped there, it went out of its way to stress that its holding did not "cast doubt" on other gun laws – and even identified a non-exhaustive list of  "presumptively lawful" measures that passed constitutional muster. *Id.* at 626-27 & n.26.  Those "presumptively lawful" measures included laws restricting, and even banning, the public carrying of weapons.  In approvingly discussing long-understood limitations on the right to keep and bear arms, the Court specifically noted that "the majority of the 19th-century courts" considered outright "prohibitions on carrying concealed weapons . . . lawful under the Second Amendment or state analogues."  *Id*. at 626.

The Court did not suggest that the Second Amendment requires that some minimal form of public carrying must be permitted.  Rather, it specifically referenced "the home," and made clear that "carry" did not imply "outside the home." *See id.* at 635 ("[A]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

register his handgun and must issue him a license *to carry it in the home*." 554 U.S. at 635 (emphasis added).[2]

In *McDonald*, the Court incorporated the Second Amendment against the states, but also "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted). The Court did not extend the Second Amendment right outside the home.

<u>Standard of Review</u>: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly rejected the "strict scrutiny test." *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) ("[S]trict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . ."). The Court's reasoning foreclosed any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any such analysis. *Id.* at 627 & n.26.

*Heller* and *McDonald* thus left lower courts to determine an appropriate standard of review: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes for self-defense. The "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing right to keep and bear arms provisions in the states, is the most appropriate standard of review for the

---

[2] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 555 U.S. 415 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits gun possession by domestic violence misdemeanants – without even mentioning the Second Amendment.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Illinois provisions at issue here.

The Two-Pronged Approach:  In the wake of *Heller*, courts have begun utilizing a two-pronged approach to Second Amendment claims.  *See, e.g.*, *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Heller II*, 698 F. Supp. 2d at 188.  Under this approach, courts ask:  (1) does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny?  *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 614 F.3d at 89.  If the challenged law or regulation does not implicate protected activity, then the law is deemed constitutional.  Even if the law implicates protected activity, however, it still will be deemed constitutional if it passes muster under the appropriate level of scrutiny.  *Marzzarella*, 614 F.3d at 89.

## ARGUMENT

For two principal reasons, 720 ILCS 5/24-1 and 720 ILCS 5/24-1.6 are constitutional.  First, the challenged provisions do not implicate protected Second Amendment activity.  Second, even if they do, the provisions are permissible regulations that further important governmental interests established by the Illinois Legislature.

## I. THE ILLINOIS UNLAWFUL USE OF WEAPONS STATUTES DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

When the pending motion for injunctive relief is viewed thorough the two-prong approach to Second Amendment claims, it is clear that statutes prohibiting Unlawful Use of Weapons, 720 ILCS 5/24-1 ("UUW") and Aggravated Unlawful Use of Weapons, 720 ILCS 5/24-1.6  ("AUUW") do *not* implicate protected Second Amendment activity because Plaintiffs have no  "right to 'possess and carry weapons in case of confrontation'" in public places.  Indeed, the Illinois Appellate Court recently rejected the arguments on which Plaintiffs' claims are based and confirmed that the AUUW "does not implicate the fundamental right to keep and bear arms in one's home for self-defense."  *People v. Dawson*, 934 N.E.2d 598, 607 (Ill. App. Ct.

2010).  This Court need look no further than that analysis to grant Defendants' motion.

### A.    The Illinois Provisions at Issue Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 554 U.S. at 635 (emphasis added); *accord Ezell v. Chicago*, No. 10-3525, 2011 WL 2623511, at *11 (7th Cir. July 6, 2011).  The Court recognized only Heller's right "*to carry* [] *in the home*," *id.* (emphasis added), and did not approve the carrying of firearms in public.  *See id.* Indeed, the Court specifically limited its holding to the right to keep firearms in the home:  "we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense."  *Id.* at 635 (emphasis added).

Plaintiffs argue, essentially, that the *Heller* Court embraced a Constitutional right to carry guns in public, but for some reason chose not to say so explicitly.  This argument does a disservice to *Heller*; it fails to acknowledge the Court's carefully crafted holding that the Second Amendment was "not unlimited," and that a (non-exhaustive) list of gun laws remained "presumptively lawful." [3]  In fact, the Supreme Court had previously held that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons," *Robertson v. Baldwin*, 165 U.S. at 281-82, and *Heller* did not question, much less reverse, this precedent.

Adhering to long-held principals of judicial restraint, Illinois courts have refused to read either *Heller* or *McDonald* as recognizing a constitutional right to carry guns in public.    In

---

[3]  Plaintiffs' argument that *Heller*, by recognizing restrictions on carrying "in sensitive places" as presumptively lawful, implicitly recognizes a general right to carry guns is unconvincing.  *See* Pls.' Br. 7.  For one, the argument ignores the Court's instruction that *Heller*'s list was merely an illustrative list of regulations that warrant a presumption of lawfulness, not intended to be exhaustive.  *See* 554 U.S. at 626-27 & n.26.  Moreover, *Heller* would appear to endorse a strict ban on firearms in "sensitive places" that goes beyond the limitations found in the Illinois provisions challenged here.

*Dawson*, the Illinois Court of Appeals rejected arguments strikingly similar to those of Plaintiffs, and held:

> *Heller specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home*, not the right to possess handguns outside of the home in case of confrontation . . . . The *McDonald* Court refused to expand on this right, explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated.

934 N.E.2d at 605-06 (internal citations omitted) (emphasis added).  *Accord People v. Williams*, 940 N.E.2d 95, 99 (Ill. App. Ct. 2010) (adopting *Dawson* and rejecting Second Amendment challenge to AUUW statute).[4]  Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality of a statute," the *Dawson* court rejected the contention that the Second Amendment protects a broad right to carry that would invalidate Illinois's law.  *See* 934 N.E.2d at 604. *See also People v. Aguilar*, 944 N.E.2d 816, 827 (Ill. App. Ct. 2011) ("We continue to adhere to our holding in *Dawson*, where the Supreme Court in *Heller* and *McDonald* specifically limited its rulings to interpreting the second amendment's protection of the right to possess a handgun in the home for self-defense purposes, not the right to possess handguns outside of the home. The Supreme Court's decisions do not define the fundamental right to bear arms to include the activity barred by the AUUW statute.").

Other courts have similarly held that the Second Amendment, post-*Heller*, does not protect a right to carry weapons in public.  In *Williams v. State*, Maryland's highest court rejected the argument that *Heller* endorsed a public right to carry handguns, holding that "*Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions *against home possession*. . . ." 10 A.3d 1167, 1177 (Md. 2011) (emphasis added) (internal citation omitted).  *See also State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to

---

[4] Although *People v. Mimes*, No. 1-08-2747, --- N.E.2d ---, 2011 WL 2507054 (Ill. App. Ct. 2011), indicated that the AUUW does implicate the Second Amendment, the court recognized that the AUUW does not "implicate conduct. . . at the core of the right to bear arms like the defense of hearth and home," and, furthermore, went on to uphold the statute.  *See id.* at *14.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

use of a handgun in the home for self-defense purposes.).

Likewise, the Fourth Circuit declined to extend the Second Amendment right beyond the home, rejecting any effort to "push *Heller* beyond its undisputed core holding." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). In refusing to extend the Second Amendment right outside the home, the court explained: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Id.* at 475.

Other courts post-*Heller* have similarly held that the right is confined to the home. *See, e.g.*, *Richards v. County of Yolo*, No. 2:09–cv–01235, 2011 WL 1885641, at *3 (E.D. Cal. May 16, 2011); *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 725 F. Supp. 2d 56, 60 (D. Mass. 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at *5 (D.N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright 'prohibition on carrying concealed weapons' as 'presumptively lawful,' far lesser restrictions of the sort imposed here … clearly do not violate the Second Amendment.") (internal citation omitted); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller.*"); *In re Factor*, No. A-5202-08T4, 2010 WL 1753307, at *3 (N.J. Super. Ct. App. Div. Apr. 21, 2010) (the U.S. Supreme Court "has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons"); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." (quoting *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008)).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Recent Seventh Circuit cases in no way suggest that the UUW and AUUW statutes implicate Second Amendment activity.  In *Ezell v. Chicago*, No. 10-3525, 2011 WL 2623511 (7th Cir. July 6, 2011), the court required that an injunction be issued against Chicago's post-*McDonald* ban on firing ranges within the city, which directly impacted the Second Amendment right to possess handguns in the home.  Specifically, the regulation eliminated firing range access within the city while at the same time conditioning firearm licensing on completion of a firearm-safety course that includes range training.  *Id.* at *3.  Thus, "[t]he effect of the ordinance is another complete ban on gun ownership within City limits."  *Id.* at 20 (Rovner, J., concurring). *Ezell* did not call into question restrictions on public gun carrying, as long as residents are able to transport guns to a range.  *Id.* at *19.  *See also* 720 ILCS 5/24-2(a)(14), (b)(4) (allowing transportation of guns).  In *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), the court approved a complete ban on defendant's firearms possession under 18 U.S.C. § 922(g)(9) due to a prior misdemeanor conviction for domestic violence.   Under the UUW and AUUW, by contrast, the core right recognized in *Heller* is expressly preserved.

Notably, in Illinois, this understanding of the Second Amendment (and its state analogues) as not protecting a general right to carry or a more particular right to carry concealed weapons predates *Heller*. *See, e.g.*, *People v. Marin*, 795 N.E.2d 953, 959 (Ill. App. Ct. 2003) (upholding AUUW as valid legislative enactment intended "to prevent any person from carrying a loaded weapon on his person or in his vehicle due to the inherent dangers to police officers and the general public") (internal quotation marks omitted); *Quilici v. Village of Morton Grove*, 532 F. Supp. 1169, 1182 (N.D. Ill. 1981) (the right to bear arms may be "limited by the states through the valid exercise of what has come to be known as the 'police power,' without fear that any United States Constitutional provisions will be infringed").  And Illinois law dictates that courts should "construe a statute in a manner that upholds its validity and constitutionality if it can reasonably be done."  *People v. McGee*, 794 N.E.2d 855, 857 (Ill. App. Ct. 2003); *see also Lebron v. Gottlieb Memorial Hosp.*, 930 N.E.2d 895, 921 (Ill. 2010) (Illinois courts "afford substantial deference to legislative enactments. Under Illinois law, statutes carry a strong

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

presumption of constitutionality.").

The same limitations on public carrying are firmly planted in statutes and jurisprudence across the country. *See* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *English v. State*, 35 Tex. 473, 473, 478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee" – in the state Constitution of the "right of the people to keep and bear arms" – "to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).[5]

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places.  For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ."  JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL

---

[5] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this consistent precedent.  *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868).  The Kentucky legislature later corrected the anomalous decision by amending the state constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

LAW OF THE UNITED STATES 152-53 (1868).  Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons."  Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L.J. 259, 287 (1874).  An authoritative study published in 1904 concluded that the Second Amendment and similar state provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," demonstrating that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security."  ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND CONSTITUTIONAL RIGHTS (1904).

The provisions at issue in this case do not meaningfully impede the ability of individuals to keep handguns in defense of their homes.  Instead, they only impact the carrying of weapons *in public*, which neither the Supreme Court nor other courts have recognized as protected under the Second Amendment.  As a result, the Court should not find that Plaintiffs are challenging protected Second Amendment activity.

### B.    The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public.

There are profound public safety rationales for restricting guns in public, as courts continue to recognize post-*Heller*:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety . . . .

*People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) (internal quotations and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor").  The carrying of firearms in public poses a number of issues and challenges not presented by the possession of firearms in

BRIEF OF AMICUS CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE

the home.  Three issues, in particular, are worthy of note.

First, when firearms are carried out of the home and in public, the safety of a broader range of individuals is threatened.  While firearms kept in the home are primarily a threat to their owners, family members, friends, and houseguests,[6] firearms carried in public are a threat to strangers, law enforcement officers, random passersby, and other private citizens.  Guns in public expose all members of society to great risks, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals . . . [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).  Another study has shown that in the last four years, concealed handgun permit holders have shot and killed at least 11 law enforcement officers and 308 private citizens.  Violence Policy Center, *Concealed Carry Killers* (2011), http://vpc.org/ccwkillers.htm.  States have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals keeping guns in their homes.

Second, the carrying of firearms in public is not a useful or effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime.  Most states that enact laws broadly allowing concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are

---

[6]  *See, e.g.*, Matthew Miller, David Hemenway, Deborah Azrael, *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003*, SOCIAL SCIENCE & MEDICINE (2006) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn, David Hemenway, *Firearm availability and homicide: A review of the literature*, 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004) ("households with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership"); Matthew Miller, et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM J. PUBLIC HEALTH 1988 (Dec. 2002) ("in areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide"); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller, et al., *Firearm availability and unintentional firearm deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

adopted."  John Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003).  Laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates."  Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) (emphasis in original).  Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," which may "raise levels of firearms murders" and "increase the frequency of homicide."  David McDowall, et al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995).  Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted.  Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, THE ECON. OF GUN CONTROL 473 (May 1998).  Several different statistical approaches to the question "indicate a rather substantial increase in robbery," while "policies to *discourage* firearms in public may help prevent violence."  John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004).  Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not protect those who possessed them from being shot in an assault." Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun . . . . If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook, et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public has other negative implications for a number of social issues and societal ills that are not impacted by the private possession of handguns in the

home.  When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation").   The ability of law enforcement to protect the public could be hamstrung if officers were required to effectively presume that a person carrying a firearm in public was doing so lawfully.  Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention.  Yet law enforcement should not be forced to wait for a gun to be fired before protecting the public.  Further, if drivers are allowed to carry loaded guns, road rage can become a more serious and even potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002).  And an increase in gun prevalence in public may cause an intensification of criminal violence.  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

   The provisions at issue here prevent many of these risks without implicating the Second Amendment activity protected in *Heller*.  Individuals in Illinois not otherwise disqualified by operation of law are allowed handguns to protect themselves in the home.  *Heller* provides no basis for expanding that authority into a broad constitutional right to carry weapons in public.

## II.  EVEN IF THE ILLINOIS STATUTORY SCHEME DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

   Even if this Court were to hold that the Second Amendment protects a right to carry guns in public, the Illinois statutory scheme is a permissible regulation of such a right under any

appropriate level of scrutiny.

A. **The Reasonable Regulation Test is the Appropriate Standard of Review.**

In choosing a level of scrutiny for Second Amendment challenges, this court should not be limited to the choices utilized in First Amendment jurisprudence,[7] for the exercise of Second Amendment rights creates unique risks and can be far more lethal than even the most dangerous speech. "Words can never hurt me," but guns are designed to inflict grievous injury and death. Prior restraint of speech may be unacceptable, but prophylactic measures to prevent shootings before they occur are essential to protect the public. The standard of review best suited to the Second Amendment is the "reasonable regulation" test, which has been applied by courts across the country, for over a century, to construe the right to keep and bear arms.[8]

Courts in over forty states have construed state right to bear arms provisions and with remarkable unanimity have coalesced around a single standard: the "reasonable regulation" test. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87 n.12 (2007). Under this test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City &*

---

[7] The Supreme Court has fashioned a variety of standards of review tailored to specific constitutional inquiries. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (Eighth Amendment's prohibition of cruel and unusual punishment measured by "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (right to choose measured by "undue burden" test); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (procedural due process requires balancing three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) ("stop and frisk" under Fourth Amendment upheld on officer's "reasonable grounds").

[8] Although *Ezell* applied a form of intermediate scrutiny to the facts before it, the Seventh Circuit did not foreclose the possibility that different standards might apply under other circumstances. *See* 2011 WL 2623511, at *13 ("the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right").

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*County of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994).[9]  This "reasonable regulation" test protects Second Amendment activity, while recognizing "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people."  *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).

The reasonable regulation test is more demanding than the rational basis test rejected by the *Heller* majority, as it focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers" and not "merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).  Further, unlike the "interest balancing" test suggested by Justice Breyer's dissent, it does not permit states to prohibit all firearm ownership. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1458 (2009); *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002); *Trinen v. City & County of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002); *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968).  Rather, the test allows laws that are reasonably designed to further public safety.  *See, e.g.*, *Robertson*, 874 P.2d at 328, 330 n.10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d at 852 (same); *Bleiler*, 927 A.2d at 1223 (same).

Adopting the reasonable regulation test here would not be at odds with the approach of other courts that have applied intermediate scrutiny following *Heller*.  In virtually all such cases,

_____

[9] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State... . . . is subject to reasonable regulation by the State under its police power.").

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

the court evaluated broad restrictions on classes of individuals and types of arms that lacked any exception for use of guns within the home.  *See, e.g.*, *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Chester*, 628 F.3d 673  (4th Cir. 2010) (upholding 18 U.S.C. § 922(g)(9));  *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) (upholding 18 U.S.C. § 922(k), barring possession of handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (upholding 18 U.S.C. § 922(g)(5), prohibiting possession of firearm by illegal alien); *United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Bledsoe*, No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) (upholding 18 U.S.C. § 922(a)(6), prohibiting false statements in connection with firearm purchase).[10]  As the Seventh Circuit recognized in *Ezell*, "the standards for evaluating Second Amendment claims are just emerging," 2011 WL 2623511, at *1, and "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  *Id.* at *13.  Because the Illinois provisions − in addition to providing other reasonable exceptions − are carefully drafted to exempt use in the home, heightened scrutiny is not appropriate here.  *See* 720 ILCS 5/24-2 ("Exemptions").

There is a profound governmental interest in regulating the possession and use of firearms.  States have "cardinal civic responsibilities" to protect the health, safety, and welfare of their citizens.  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside*

---

[10]  The only exception appears to be *Heller v. District of Columbia II*, in which plaintiffs challenged the District of Columbia's firearm registration procedures, and prohibitions on assault weapons, and large capacity ammunition feeding devices.  698 F. Supp. 2d 179, 181 (D.D.C. 2010).  But in that case, two of the three provisions were broad restrictions on classes of weapons.

*Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . ."). States are generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted). Regulations on gun carrying are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

While individual opinions differ on the risks posed by guns, such disagreement underscores that firearm regulation is best suited for the legislative arena. *See Miller*, 604 F. Supp. 2d at 1172 n.13 ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches."). Legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (state legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotations and citations omitted). State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

The risk posed by unduly restricting these legislative judgments is severe, and courts

should review such judgments with appropriate deference.  The reasonable regulation test is best situated to provide due deference to these legislative judgments.

### B.    The Illinois Statutes at Issue Are Constitutional.

The UUW and AUUW pass the reasonable regulation test.  These challenged provisions do not infringe on the Second Amendment rights of law-abiding, responsible citizens to a gun in the home for the self-defense.  To the contrary, they specifically exempt use within one's home and place of business.  *See* 720 ILCS 5/24-1 and 720 ILCS 5/24-1.6 (categorically exempting use on one's own land or in one's own "abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission").  Illinois law also expressly allows the use of firearms for other purposes, including hunting, and allows for the transportation of weapons.  *See* 720 ILCS 5/24-2.  The statutes, moreover, serve "to prevent any person from carrying a loaded weapon on his person or in his vehicle" in order to guard against "the inherent dangers to police officers and the general public."  *See People v. Marin*, 795 N.E.2d 953, 959 (Ill. App. Ct. 2003) (upholding AUUW); *see also People v. Mimes*, No. 1-08-2747, --- N.E.2d ---, 2011 WL 2507054, at *17 (Ill. App. Ct. 2011) ("[T]he carrying of uncased, loaded and accessible firearms in public on the street, even if for the purpose of self-defense, poses unusual and grave dangers to the public, particularly innocent bystanders who may be severely or fatally injured by stray bullets.").  The Second Amendment does not forbid state or local governments from restricting the public carrying of firearms as Illinois has done.[11]

---

[11] Even under intermediate scrutiny, which *amicus* maintains need not be applied in this case, the Illinois statutes pass constitutional muster. *See Mimes*, 2011 WL 2507054 (applying intermediate scrutiny and upholding AUUW); *see also Aguilar*, 944 N.E.2d 816.  Indeed, a number of courts have found that the protection of the public from firearm violence is an important government interest, *see, e.g.*, *Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F. Supp. 2d at 1171; *Bledsoe*, 2008 WL3538717, at *4, and upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g.*, *Marzzarella*, 614 F.3d at 101; *Heller*

## CONCLUSION

For all the foregoing reasons, *amicus* respectfully requests that the Court find 720 ILCS 5/24-1 and 720 ILCS 5/24-1.6 to be constitutional.

Dated: July 27, 2011

Respectfully submitted,

   s/ Robert J. Harris
Robert J. Harris
Harris Winick LLP
333 West Wacker Drive
Suite 2060
Chicago, Illinois 60606

Jonathan L. Diesenhaus
S. Chartey Quarcoo
Matthew C. Sullivan
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Counsel for *Amicus Curiae*

---

*II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah 2009); *Yanez-Vasquez*, 2010 WL 411112, at *3; *Miller*, 604 F. Supp. 2d at 1171-72; *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009); *United States v. Radencich*, No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009); *People v. Flores*, 169 Cal. App. 4th 568, 574-75 (2008); *Bledsoe*, 2008 WL 3538717, at *4.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(B)(4)(c), I hereby certify that this brief was produced in Times New Roman 12 point typeface.  The brief complies with the length requirement provided in Local Rule 7.1(B)(4)(b)(1), containing 6,989 words.

___ s/ Robert J. Harris _____
Robert J. Harris
