1      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2              SPRINGFIELD DIVISION

3

4   MICHAEL MOORE, et al.,          )
                                    )
5           PLAINTIFFS,             )      11-3134
                                    )
6        VS.                        )
                                    )
7   LISA MADIGAN, et al.,           )      SPRINGFIELD, ILLINOIS
                                    )
8        DEFENDANTS,                )

9

10           TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SUE E. MYERSCOUGH
11             U.S. DISTRICT JUDGE

12   AUGUST 4, 2011

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:         MR. DAVID JENSEN
                                ATTORNEY AT LAW
15                              61 BROADWAY
                                NEW YORK, NY
16                                   and
                                MR. DAVID G. SIGALE
17                              ATTORNEY AT LAW
                                739 ROOSEVELT ROAD
18                              GLEN ELLYN, IL

19   FOR THE DEFENDANT:         MR. TERENCE CORRIGAN
                                MR. DAVID A. SIMPSON
20                              MS. KAREN McNAUGHT
                                ILLINOIS ATTORNEY GENERAL
21                              500 S. SECOND
                                SPRINGFIELD, IL
22

23   COURT REPORTER:           KATHY J. SULLIVAN, CSR, RPR
                               OFFICIAL COURT REPORTER
24                             600 E. MONROE
                               SPRINGFIELD, ILLINOIS
25                             (217) 525-4199

1                          I N D E X

2    WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
     (NONE.)
3

4

5

6

7

8

9

10

11

12                    E X H I B I T S

13   GOVERNMENT'S EXHIBIT
14   NUMBER                IDENTIFIED   ADMITTED

15

16

17

18

19   DEFENDANT'S EXHIBIT
     NUMBER                IDENTIFIED   ADMITTED
20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2         *    *    *    *    *    *    *    *    *    *    *

3              THE COURT:  Good morning.  We have before

4    us today civil docket case 11-CV-03134, this is

5    Moore versus Madigan.

6         We have for the Plaintiff Moore, Hooks, and the

7    Second Amendment Foundation, David Jensen.

8              MR. JENSEN:  That's me, Your Honor.

9              THE COURT:  All right.  Good morning.  And

10   David, is it --

11             MR. SIGALE:  Sigale.

12             THE COURT:  Sigale.

13             MR. SIGALE:  Yes.  Good morning, Your

14   Honor.

15             THE COURT:  And on behalf of the defendants

16   we have Terry Corrigan.  And who's with you today?

17             MR. CORRIGAN:  David Simpson.

18             MR. SIMPSON:  David Simpson, Your Honor.

19             THE COURT:  Mr. Simpson.  I note

20   Ms. McNaught is behind you.  She is welcome to join

21   you at counsel table if she wishes.

22             MS. McNAUGHT:  I will just move up here.

23             THE COURT:  All right.  This cause is

24   called for hearing on a motion for preliminary

25   injunction.  We have briefs by everyone, including
```

1    the Amicus brief filed, and the response thereto,

2    last night at 5:00.  I have reviewed all of the

3    above and we are here today for argument.

4        Will there be any evidence presented today?

5            MR. JENSEN:  We don't plan on submitting

6    any evidence, Your Honor.

7            MR. CORRIGAN:  Your Honor, we weren't going

8    to call witnesses, but I do have a copy for the

9    Court of some of the studies that we cited in the

10   brief with Internet references.  I just printed them

11   off of the Internet if the Court would like them.

12           THE COURT:  Is there any objection?

13           MR. JENSEN:  We would object on relevance

14   grounds, but we don't have any objection based on

15   authenticity.

16           THE COURT:  I haven't read them so I don't

17   know how to rule on the objection.

18           MR. JENSEN:  Fair enough.

19           THE COURT:  The Court will accept them at

20   this time and review them and then rule on the

21   motion.

22       All right.  Who will be arguing?

23           MR. JENSEN:  I will, Your Honor.

24           THE COURT:  All right.  Please proceed.

25           MR. JENSEN:  Well, Your Honor, the argument

1    is very straightforward.  We don't believe that

2    there are any issues of fact.

3         It makes somewhat sense to simply begin by

4    taking a look at what issues are in dispute and

5    which issues are not in dispute, which I believe is

6    relatively clear based on a review of the papers

7    that have been submitted.

8         First and foremost, there's no dispute, or

9    there's no significant dispute, that the laws of the

10   state of Illinois prohibit the act of carrying

11   firearms in public.  The state defendants do make

12   some claim that the state's prohibition could be

13   characterized as a time, place, and manner

14   restriction in their oppositions papers.

15        Earlier in the papers there's a general

16   concession that the ban is on carry, and as a

17   practical matter there does not seem to be any

18   dispute that the actual terms of state laws -- of

19   the state laws at issue under virtually all

20   circumstances prohibit private citizens from

21   carrying firearms in public.

22        There also does not appear to be any

23   substantial dispute that the essential nature of the

24   Supreme Court's ruling in Heller was to conclude

25   that the terms of the Second Amendment, and

1  particularly the protection of the right of the

2  people to keep and bear arms, protects both the

3  right to possess and carry modern arms including

4  firearms, specifically including handguns.

5      The issue focuses on whether or not the Heller,

6  and for that matter McDonald rulings, are limited to

7  the home or have never been recognized beyond the

8  home, or whether in fact the Second Amendment does

9  apply as a general proposition and without regard to

10 whether or not a person is standing within the

11 confines of their home.

12     This is an issue that turns simply on rules of

13 stare decisis and consideration of the issues the

14 court in Heller actually addressed.

15     The state's -- the Heller court's treatment of

16 the term "bear arms" in the context of interpreting

17 or construing the phrase "keep and bear arms"

18 largely, if not entirely, resolves the present

19 question of whether or not there is a right to bear

20 arms and what exactly that right means.

21     So while we have an argument from the state

22 that essentially goes along the lines of there may

23 be some sort of a right to bear arms, but it's

24 unclear exactly what that right is; it can be

25 restricted, it can be banned, it's not really clear.

1          The Heller court, in the course of determining

2      whether or not the term "bear" applied to personal

3      conduct as opposed to conduct that was under the

4      auspices of military authority or for military

5      purposes, looked at American authorities from, in

6      particular, the 19th century.  And more

7      particularly, many authorities falling within the

8      period between the time the Constitution was

9      ratified and the time that the 14th Amendment was

10     ratified.  And concluded that the majority view of

11     state courts in the United States have been that the

12     right to bear arms was a right to carry arms.

13         In this light most all of the decisions that

14     the state cites to support the claim that the Second

15     Amendment can be constrained in a manner such that

16     people would not have the ability to carry firearms

17     in public under any set of conditions, that these

18     cases really show exactly the opposite.

19         And that's really what the Supreme Court found

20     in Heller.  Which is that the -- first of all, most

21     of the 19th century authorities that are pertinent

22     and that discuss the issue of bearing arms consider

23     the discrete issue of whether states can ban or

24     license the concealment of firearms in public rather

25     than the basic -- the more basic question of whether

1    states can completely preclude the act of carry.

2         So many of the state court decisions, as noted

3    by the court in Heller, concludes that while there

4    is a right to carry arms but a restriction on

5    concealed firearms, is simply a restriction on the

6    time, manner, and place that firearms are carried,

7    and that it is a permissible one.

8         Now that question, which is not the question

9    that's presented in this case, because the laws of

10   the state of Illinois don't allow people to carry or

11   not carry firearms openly or concealed.  The answer

12   and the reasoning that's applied in resolving that

13   question indicates that there is a general right to

14   carry arms.  And once that point is reached, there

15   is really no remaining dispute, because we don't

16   have a restriction on carrying arms.

17        We're not here talking about, for example, a

18   requirement that someone have certain attributes in

19   their background.  That they -- that they satisfy

20   training requirements, that they meet qualifications

21   requirements, that they meet vision requirements, or

22   any other set of restrictions.  We are talking about

23   the fact that no matter what someone's circumstances

24   may be or what conditions they're willing to comply

25   with, there simply is no ability available to them

1    to carry a firearm for self-defense in Illinois once

2    they have left their own private land.

3         THE COURT:  Well, there is some limited

4    use.  I know I've had my gun in the car before for

5    transportation purposes.  Broken down and in a case.

6         MR. JENSEN:  Well, Your Honor, I think

7    that's a good point, because the right to bear arms

8    is the right to carry firearms in case of

9    confrontation implies necessarily the ability to

10   actually have firearms operable and functional.

11        And I suppose what I could really say on that

12   exact, on that exact point, is I'm stopping here

13   today to attend this hearing on my way back from a

14   family trip in Lake Powell in Arizona and Utah to my

15   home in the Hudson Valley of New York.  I was

16   lawfully allowed to carry a handgun in my vehicle,

17   loaded and ready for use, at all points in my trip

18   except the point in time when I was in Illinois, at

19   which point I stopped the car, unloaded the gun, put

20   it in a case, and put it in the trunk.

21        The essential difference in the Illinois

22   regulatory scheme is that there is no provision

23   whatsoever made for the ability to carry an operable

24   firearm.

25        THE COURT:  Was there a recent case in

1    Illinois that said an Indiana resident did not have

2    to do what you did when coming into Illinois?  Are

3    you aware of that case?

4         MR. JENSEN:  I am aware of a relatively

5    recent decision from the Illinois Supreme Court; the

6    name escapes me; and it has to do with non-residents

7    and the firearm owner's I.D. card requirement.  But

8    does not have to do with the ability to carry a

9    firearm for protection purposes.

10        THE COURT:  Okay.  I found Heller very

11   interesting.  I use to be an English teacher so I

12   like the history that was set forth.

13        But my question to you is; sitting here in this

14   court, what am I to do in light of Ezell and Scion?

15        My understanding is that the panel in Ezell was

16   required to follow the en banc decision in Scion.

17   It did not, or it certainly digressed.  What is

18   stare decisis to me as I sit here today in the 7th

19   Circuit?

20        MR. JENSEN:  Well, first and foremost,

21   setting aside any decision in the 7th Circuit, the

22   first stare decisis concern ought to be what has the

23   Supreme Court necessarily decided.  And on that

24   point the issue of what are the bounds of stare

25   decisis.

1      The relatively clear rule in the 7th Circuit

2   under Sarnov and other authorities is that if a

3   point of rationale is could not be deleted from the

4   opinion without seriously undermining the analytic

5   underpinnings as a part of the whole.

6      Now, setting aside the question of whether

7   there's some academic basis on which the court could

8   have decided Heller without concluding that the

9   right to bear arms is the right to carry arms, the

10   fact is that how the court decided Heller is you

11   could not remove that aspect of the decision without

12   seriously undermining the analytic underpinnings.

13      That very issue had been the issue that had

14   been the basis for the District Court's denial of

15   the plaintiff's motion for summary judgment and the

16   D.C. Circuit's reversal of that decision.  Whether

17   or not the right to bear arms is the right to carry

18   arms and whether or not -- whether instead it

19   connoted the use of firearms only in a military

20   setting or in accordance with military dictates.

21      Now, having said that, neither; and I have

22   never known how to say this; Scion nor Ezell

23   addresses the issue of carry.  Both of them

24   implicitly recognize that the Second Amendment does

25   not end at the threshold of the home.  Even Scion

1  was caught carrying a gun in his truck.  And the

2  very law that's at issue of Ezell is the right to

3  use handguns outside one's home in the city of

4  Chicago.

5       The real issue that is, we would submit,

6  dispositive of all of the issues in the case, is

7  simply whether there is in fact merit to the

8  argument that the Supreme Court has limited or has

9  not recognized a right to carry outside the home.

10      If the Supreme Court recognized that the -- if

11 the Supreme Court has recognized the Second

12 Amendment as a right that does not end at the

13 threshold of one's home, then it is a relatively

14 straightforward matter that state law absolutely

15 prohibiting the activity is not going to survive

16 scrutiny and a preliminary injunction should issue.

17      On the other hand, if the Second Amendment, the

18 right to keep and bear arms, is a homebound

19 amendment or a private property bound right, then

20 for all practical purposes state laws that by their

21 terms prohibit the carry of firearms in public

22 really don't raise any constitutional concerns.

23      So in a lot of ways Illinois state laws, given

24 their uniqueness in the American landscape, present

25 the cutting edge of Second Amendment.  And that is

1    is this limited to the home or is it a more general

2    right that simply has a zenith or a high point in

3    the home.

4            THE COURT:  Is Peruta your best case on

5    concealed carry?

6            MR. JENSEN:  I don't know if I would call

7    Peruta our best case.  I would say that of U.S.

8    District Court decisions that have been issued to

9    date that have addressed the issue of carry, it's

10   the most on point case.

11       But there is one very significant factor of

12   Peruta that has to be kept in mind.  And that is

13   that California state laws did not, by their terms,

14   prohibit people from carrying firearms.

15       According to the Peruta court's view, the

16   requirement was simply that if you're going to carry

17   a firearm you have to get this carry license, you

18   have to carry the firearm exposed, and you can't

19   have ammunition in it, although you can have

20   ammunition next to it.

21       Whether that rationale actually stands up in

22   the future remains to be seen.  But regardless of

23   whether it stands up, that rationale wouldn't make

24   any difference here because this is not a situation

25   where the state laws of Illinois say it's illegal to

1  carry a firearm concealed but it's okay to carry one

2  in the open.

3          THE COURT:  So the Supreme Court has not

4  told me what standard to apply, what standard of

5  scrutiny.  What standard do I apply?

6          MR. JENSEN:  I think that's a very good

7  question, Your Honor.  And the answer to that is

8  twofold.

9      The most direct and immediate answer is that

10  the Ezell decision largely resolves that.  And it

11  resolves it in a manner that is largely consistent

12  with the view that most other circuit Courts of

13  Appeal have taken.  Probably the leading case in

14  this regard is the 3rd Circuit opinion in United

15  States versus Marcarella.

16      The standard under Ezell and as indicated by

17  Heller, the First Amendment is the most analogous

18  protection to the Second Amendment.  They both

19  protect affirmative conduct, they're both part of

20  the original eight amendments to the Bill of Rights.

21      In both contexts the degree of scrutiny that

22  applies depends on how close a regulation comes to

23  the core of the Second Amendment and how substantial

24  the burden -- how substantial of a burden is

25  imposed.

1       Now, we would submit that just as the
2  controversy in Heller did not actually require
3  resort to a standard of scrutiny, the controversy
4  here also does not require resort to a standard of
5  scrutiny.
6       And the reason is that laws that simply
7  prohibit things that are affirmatively protected by
8  the Constitution are invalid without regard to a
9  standard of scrutiny.
10      The entire context of rational, intermediate,
11  and strict scrutiny in this entire framework of
12  means and analysis is examining burdens on the
13  exercise of constitutional rights.  If we were in
14  here talking about, well, you've got to wait six
15  months and pay a hundred dollars to get a license
16  before you can carry a gun around, that's a burden.
17  That's where intermediate, rational scrutiny at
18  least in theory come into play.
19          THE COURT:  Well, I'm back again to my
20  original question; Scion or Ezell?  Ezell says what
21  you're saying.  Scion told me it's an intermediate
22  scrutiny that needs to be applied.
23          MR. JENSEN:  Well, with all due respect, I
24  disagree slightly with that characterization.  Scion
25  applied intermediate scrutiny on the facts of this

1    case, and the ongoing Scion decision retracted the

2    First Amendment analysis in the original panel's

3    decision and said we don't need to reach this issue.

4    The Supreme Court said that certain categories of

5    people can be disqualified.

6         We think on the facts of this case; which

7    should be remembered was a guy who had been

8    convicted two or three times of domestic violence

9    and was currently on probation for that offense; on

10   the facts of this case we don't find a violation,

11   intermediate scrutiny applies.

12        What the Scion decision does not say is that

13   without regard to how close the law comes to the

14   core of the Second Amendment, and without regard to

15   how substantial the burden is, intermediate scrutiny

16   applies.

17        The standard of scrutiny that applies requires

18   you to first look at what is the conduct that's

19   being regulated and what is the nature of that

20   regulation.

21             THE COURT:  I have a question that has not

22   been raised.  This posture of this case is different

23   than all of the other cases that I've read that

24   you've cited to me.  Is Lisa Madigan the proper

25   party in this case?  Does she enforce this law?

1          MR. JENSEN:  Well, her statutory duties

2     include -- to give a short answer to that, her

3     statutory duties include participating in the

4     prosecution of criminal offenses and advising local

5     county attorneys on the prosecution of criminal

6     offenses.

7          In our view that's a sufficient level of

8     personal participation in enforcement of the law to

9     make the Attorney General a proper defendant.  And I

10     would have to note that unless I'm missing

11     something, this is not an argument that's been

12     raised --

13          THE COURT:  No, I just said nobody had

14     raised it, but I kept coming back to it as I read

15     these cases.

16          MR. JENSEN:  I mean given that the

17     statutory duties of the Attorney General include

18     assisting county attorneys in the prosecution of the

19     law, it's certainly not a situation where the

20     Attorney General could come in and say, well, under

21     no set of circumstances are we involved in enforcing

22     this law.  You know, there's no set of circumstances

23     where we would give people advice.

24          It's quite true, I think, that front line of

25     enforcement of this law, and all other criminal

1   laws, is going to be county attorneys and policemen.

2   But that doesn't mean that the Attorney General is

3   not involved in the law enforcement process.

4           THE COURT:  Okay.

5           MR. JENSEN:  Unless the Court has anything

6   further, that is what we wanted to present.

7           THE COURT:  Thank you.  And I thank you

8   again for your prompt response to the Amicus brief.

9   I know you didn't have very much time and you did a

10  nice job.

11          MR. JENSEN:  We do what we can, Your Honor.

12          THE COURT:  Thank you.

13          MR. JENSEN:  Thank you.

14          THE COURT:  Mr. Corrigan, will you be

15  arguing?

16          MR. CORRIGAN:  Your Honor, if the Court

17  would permit we'd like to split the argument in

18  half, with --

19          THE COURT:  That's fine.

20          MR. CORRIGAN:  -- the question of

21  likelihood of success on the merits addressed by

22  Mr. Simpson who has the historic background

23  knowledge that I don't have.

24          THE COURT:  That's fine.

25          MR. CORRIGAN:  And he will go first.

1          MR. SIMPSON:  Thank you, Your Honor.

2      Your Honor, this case is not about whether gun

3  regulations are a good or a bad idea.  And it's not

4  about broadly whether there's a right to carry guns

5  outside the home.  Illinois allows people to carry

6  guns outside the home, loaded and functioning, under

7  certain circumstances.

8      The question is whether democratically elected

9  legislatures, indeed any democratically elected

10 legislature, can make the choice that Illinois has

11 made here.  And Heller does not settle this

12 question.

13     And I don't want -- I'm not going to spend the

14 whole time reading to you, but there's just two

15 quick things that I think make it clear that Heller

16 doesn't settle this question.

17     One, Heller itself says on Page 626, that "like

18 most rights, the rights secured by the Second

19 Amendment is not unlimited.  From Blackstone through

20 the 19th century cases commentators and courts

21 routinely explain that the right was not a right to

22 keep and carry weapon -- any weapon whatsoever or in

23 any manner whatsoever and for whatever purpose."

24     So Heller itself, by its explicit terms,

25 doesn't tell us that you always have a right to

1  carry guns, it says that that right is the -- the

2  definition of carry is limited by historical

3  circumstances.

4      For the same reason Scion, at Page 640 in the

5  en banc opinion, says explicitly that the Second

6  Amendment creates individual rights, one of which is

7  keeping operable firearms at home for self-defense.

8  What other entitlements the Second Amendment creates

9  and what regulations legislatures may establish were

10  left open in Heller.

11      So then the question is not a mechanical

12  application of precedent in Heller, because Heller

13  just didn't address the question that we have here.

14  Instead we need to look to Heller's underlying

15  reasoning and underlying methodology in order to

16  figure out whether the Second Amendment has any

17  bearing here.

18      So being faithful to that understanding in

19  Heller means that we need to undertake the same sort

20  of in-depth historical analysis that the court

21  undertook in Heller.

22      Heller specifically tells us that the Second

23  Amendment did not create a new right, it merely

24  codified an existing right that existed under

25  English law.  And so no matter what tack you take

1   under Heller, English and founding era history is

2   going to be highly relevant to the consideration.

3   And indeed we maintain as we explain in our brief

4   that it should be dispositive.

5         Ezell suggested that -- that the increase focus

6   on 19th century history.  As we discuss, that's

7   simply just flatly contrary to the United States

8   Supreme Court's approach in every single other

9   constitutional right.  There aren't two -- there

10  isn't one Second Amendment as applied to the state

11  and one as applied to the federal government.

12        Understanding, of course, that you're not

13  going -- we're not going to ask you to take on the

14  7th Circuit; even if 19th century history is to be

15  excluded and Ezell is right and we should focus on

16  the time of the adoption of the Fourteenth Amendment

17  instead of the Second Amendment, the original

18  understanding of the Second Amendment remains vital.

19  Because the original understanding of that

20  pre-existing English right that was codified in the

21  Second Amendment certainly was going to inform what

22  the framers of the Fourteenth Amendment thought that

23  they were doing.

24        And so if you look at that history, Your Honor,

25  we see that English law and at the founding it was

1    well established that people had a right to keep

2    guns in their homes for their own protection.  And

3    that's exactly what Heller held; a man's home is his

4    castle.  But there was no similar right to carry

5    guns in public places for self-defense.  Indeed,

6    English law banned carrying guns in public places

7    for self-defense for hundreds of years.

8         And those restrictions are mentioned, as we

9    cite in our brief, for Cook and Blackstone.  We

10   could have cited others, but those are the most

11   prominent of the common law scholars who tell us

12   that -- that -- in the words of the original English

13   statute, riding or going armed in public places was

14   a crime under English law.

15        So there's no reason to think that when the

16   framers of the Second Amendment adopted this English

17   right that they meant to change it in any way.

18   Indeed, again, Heller suggests that they didn't.

19   Heller says that they merely codified the same right

20   that had been known for years and years as English

21   law.

22        Now, the plaintiffs don't rebut this

23   understanding of the founding era and the English

24   era understanding of the right to bear arms.

25   Instead, they point to a series of 19th century

1  cases; some of which we admit held that there must

2  be a right to carry arms in public, either concealed

3  or openly.  There are two problems with this

4  analysis though.

5      First, these cases are too late to speak to the

6  pre-existing -- the nature of the pre-existing

7  English right.  And again, you see this treatment of

8  history in Heller itself.  Although Heller

9  discussions 19th century history, on Page 614 in

10  Heller it notes that some of the history discussing

11  took place after the ratification of the Second

12  Amendment and "do not provide as much insight into

13  the original meaning as earlier sources."

14      So the sort of 19th century understanding of

15  the Second Amendment right to bear arms are too late

16  to speak to what the framers of the Second Amendment

17  thought that they were doing.

18      But in any event, even if you take these --

19  take these 19th century cases at their face value,

20  they're at best conflicting.  We have some state

21  courts that suggest that the right to bear arms

22  includes a right to carry weapons in public, but you

23  have other courts that suggest otherwise and you

24  have other laws that suggest that the -- that

25  legislatures throughout the 19th century thought

1    that they had broad power to restrict the carrying

2    of firearms in public, both concealed firearms and

3    open firearms.

4         And as some of the examples we cite in our

5    brief, if you look at the laws in D.C. or in

6    Wyoming, would have been federal enclaves at the

7    time and would have specifically been subject to the

8    restrictions of the Second Amendment.  And it would

9    be strange if say a Congress in 1876 were going to

10   be considering restrictions in the territory of

11   Wyoming even though that was the exact same time

12   period of the incorporation of the Second Amendment

13   against the states through the Fourteenth Amendment.

14        And as far as that bears on our procedural

15   posture in this case, Your Honor, this conflict,

16   even if we, again, ignore the fact that we have a

17   difference of opinion in 19th century history, that

18   leads us to two conclusions.

19        One conclusion, of course, is that, as we

20   suggested earlier, whatever later disagreements or

21   misunderstandings may arise about the nature of the

22   right to bear arms, none of that could change what

23   the framers codified in the Second Amendment.

24        The other is that given this conflict in 19th

25   century law, plaintiffs cannot carry their very high

1    burden of showing likelihood of success on the

2    merits for preliminary injunction; particularly

3    preliminary injunction as incredibly broad natured

4    as they seek.

5         So, Your Honor, I don't want -- I don't want to

6    spend extra time on this point.  I mean I think

7    it's -- I say it's clear, to summarize, that Heller

8    does not itself settle this case.  To argue that the

9    fact that there is a right to carry arms means that

10   the right to carry arms is a right to carry them

11   anywhere under any circumstances is merely to beg

12   the question.

13        Heller instructs us to engage in an in-depth

14   historical analysis to understand the original

15   meaning of the pre-existing English right that was

16   codified in the Second Amendment.  That original

17   analysis demonstrates that there was no widely

18   recognized constitutional right or fundamental right

19   to carry arms in public places at the time of the

20   founding.

21        So, Your Honor, if the Court doesn't have any

22   questions for me, then I would say there's just --

23   plaintiffs have not shown a likelihood of success on

24   the merits.  And that alone is a reason to deny the

25   preliminary injunction motion.

1          THE COURT:  Thank you, Mr. Simpson.

2   Mr. Corrigan.

3          MR. CORRIGAN:  Thank you, Your Honor.

4      In addition to the likelihood of success on the

5   merits the Court needs to consider the other

6   elements that are necessary for a preliminary

7   injunction.

8      The first of those elements that plaintiff need

9   to show is that they are going to suffer irreparable

10  harm if an injunction is not entered.

11     In this case individually the plaintiffs have

12  made no claim of irreparable harm.  Instead, relying

13  on Ezell, they claim they don't need to show

14  irreparable harm because the violation of a

15  constitutional right is in and of itself irreparable

16  harm.

17     And that is a statement that the Ezell court

18  made.  But two factors are distinguishable in this

19  case from the facts before Ezell.

20     First of all, the nature of the right.  In

21  Ezell the Court found not that, as plaintiffs

22  indicated, that there was a Second Amendment right

23  to use such guns outside the home in the City of

24  Chicago.  That's not what the Ezell court found.

25     The Court found that under the facts of that

1  case the total restriction on the ability for

2  firearm ranges to be built in Chicago impacted

3  adversely the constitutional right to have a firearm

4  in the home for self-protection, the very right that

5  was found in Heller.

6      The Court said that, first of all, there was a

7  requirement of proficiency in order to get a permit

8  for a gun.  They couldn't get proficient without it.

9  And there's -- as an adjunct, people need to be able

10  to be proficient in order to protect themselves in

11  the home.  So they found that the -- the ordinance

12  at issue in Ezell burdened the constitutional right

13  to use firearms within the home.

14      So that in saying that they didn't need to show

15  irreparable harm because there was a violation of a

16  constitutional right; or impingement, I'm sorry, of

17  a constitutional right; it was a recognized

18  constitutional right, a recognized right to use

19  firearms in the home for protection.

20      In this case plaintiffs are asking the Court to

21  enter a preliminary injunction.  We're not talking

22  about a recognized constitutional right.  They're

23  asking the Court to do this based on a likelihood of

24  success on the merits, which is different than a

25  finding that there's a constitutional right

1  impinged.

2      When there's no recognized constitutional

3  right, there's no authority that says the Court can

4  just assume that that is a burden on the Second

5  Amendment and that irreparable harm does not need to

6  be demonstrated.

7      Secondly, the Ezell court was dealing with a

8  facial challenge to the statute.  And the Ezell

9  court said, because we're dealing with a facial

10  challenge, individual harms are not at issue.

11      In this case we are not dealing with a facial

12  challenge.  Plaintiffs have carefully pled this as

13  applied challenge.  A broad, applied challenge, but

14  applied challenge nevertheless.  In which case

15  individual harms are not relevant and there has been

16  no showing of any claim of any individual harm.

17      But more importantly, the plaintiffs have given

18  short shift to the balancing of equities that the

19  Court must undertake in granting the broad relief

20  that the plaintiffs seek.

21      Their first claim of irreparable harm -- pardon

22  me, of balancing rather, that there's no harm to the

23  public, is their statement that, well, there can't

24  be harm to the public because every other state

25  allows people to carry guns outside the home.

1          First of all, that concept, that argument, is a

2     repudiation of the concept of federalism that the

3     state legislature of Illinois has to agree with 49

4     other state legislators -- legislatures as to what

5     is in the best interest of the citizens of this

6     state.

7          But more importantly, there's no support for

8     the concept that any of those 49 other states allow

9     the broad carrying of guns that this Court would be

10    allowing if the Court granted the preliminary

11    injunction sought.

12         What plaintiffs are seeking in this case is a

13    preliminary injunction that restricts the ability to

14    carry -- to enforce the laws of the state of

15    Illinois with regard to anybody with a FOID card to

16    carry guns in public in any manner; any weapons in

17    any manner in public.  In any place in public.

18         Now, there's a separate statute, section of the

19    statute, that prohibits carrying weapons in certain

20    places because it's considered aggravated unlawful

21    use of weapons if they're in certain government

22    buildings.  It's unclear whether or not the

23    plaintiffs are asking for that to be stricken down.

24         And there's another section which makes it

25    aggravated if it's in -- I believe it's in the

aggravated section; but it's unlawful to have a
weapon in a place serving alcoholic beverages.  It's
unclear whether that's a public place that
plaintiffs are seeking to strike it down.

But subject to that, they are asking that any
other location this Court allow any person that has
a FOID card, with or without training, without
regard to age, without regard to any mental
impairment that hasn't resulted in withdrawal of
FOID privileges, be allowed to carry a weapon in any
place that they want.

And there is no suggestion that any state has
that broad statute that would allow that without any
restriction whatsoever on either place or manner of
carrying firearms that plaintiffs are asking this
Court to impose.

And beyond that, there is significant evidence;
and granted, we will say that there is conflicting
evidence; in studies done that indicates that there
is a societal cost to carrying firearms in public.

There's suggestion that the rate of firearms
deaths goes up with public carrying of firearms.
There's actually evidence that crime in general goes
up with the carrying of firearms in public.  So
there are societal costs that need to be considered

1   even with restricted carrying of firearm in

2   public -- firearms in public.

3       Based on that, it's highly likely that the

4   unrestricted carrying of firearms in public that

5   plaintiffs have asked this Court to impose would

6   have great societal costs.

7       Plaintiffs suggest in their brief, at Page 11,

8   that the Court can't look at the damage that would

9   be caused by the injunction that they are asking the

10  Court to impose.  And instead say that the Court

11  must look at the harm that would be created by a

12  properly regulated statute.  They don't define

13  what's properly regulated.  They certainly aren't

14  asking the Court to write a contrary statute,

15  they're asking the Court to simply strike down the

16  statute.

17      And the basis for that argument is a single

18  sentence in the Ezell opinion.  And that sentence

19  was that the court said that it doubted that there

20  would be serious harm from properly regulated

21  firearms ranges in the City of Chicago.  That

22  certainly is a far cry from indicating that the

23  Court can't considered the impact of its injunction,

24  particularly if we consider what was going done in

25  Ezell.

1        Ezell did not say that the City of Chicago
2   could not regulate firearms, or that they struck
3   down an ordinance that prohibited all firearms
4   ranges.  They didn't say that every citizen in
5   Chicago could erect targets in their backyard and
6   start blasting away.
7        That's the equivalent of what the plaintiffs
8   are asking for in this injunction.  They're not
9   asking for properly regulated firearms carrying in
10  the state of Illinois, they're talking about
11  completely unregulated.
12       And it's important to consider the firearms
13  ranges at issue in Ezell were not going to spring up
14  instantaneously.  It required that somebody go back
15  to the City of Chicago, get zoning permits that
16  would allow the firearms ranges.  There was going to
17  be regulations.  All the court said is we're
18  enjoining you from denying all firearms ranges based
19  on this statute.  That's a far cry from what the
20  plaintiffs are asking in this case.  There was going
21  to be every opportunity for there to be regulations
22  in the City of Chicago.
23       And so the Court does, in fact, have to look at
24  the harm that would be caused by the injunction that
25  the Court's being asked to impose.

1    The plaintiff's final argument in regard to the

2    balancing is that at Page 14 they make the assertion

3    that they're entitled to this injunctive relief no

4    matter what the societal costs are.  In other words,

5    to hell with the public, they're entitled to their

6    guns no matter how many innocent lives it will cost.

7        That is not the standard for a preliminary

8    injunction.  There is no authority that allows the

9    Court to completely disregard societal damages as

10   plaintiffs would suggest based on their claim that

11   this Court should enter a preliminary injunction.

12       This Court, on a preliminary injunction, must

13   consider the balancing of harms.  And the plaintiffs

14   have offered nothing to negate the fact that society

15   will be harmed.  And it's significant because this

16   is an item on which the plaintiffs bear the burden

17   of proof when asking for injunctive relief.  They

18   have offered no evidence whatsoever that their

19   injunction will not harm the public.  And that's

20   part of what the plaintiffs need to prove in order

21   to establish a right to a preliminary injunction.

22       One point I wanted to discuss; the Court's

23   question about whether Lisa Madigan is a proper

24   party.  We didn't raise that and we didn't raise it

25   for a reason.  While we still reserve the right in

1   any answer to raise it as an affirmative defense,

2   there is 7th Circuit authority, I believe it was on

3   the case discussing sexually explicit games or

4   ultraviolent games, and a prohibition on games, that

5   Lisa Madigan was a proper party because she could

6   enforce the law.

7       It was either that or on videos, I forget off

8   the top of my head which case it was.  It was either

9   videos or games.  But the court did say that she was

10  a proper party.  And we certainly are not asking

11  this Court to overrule the 7th Circuit in that

12  regard.  And so that's why we didn't raise it.

13          THE COURT:  Thank you, Mr. Corrigan.

14          MR. CORRIGAN:  If I could just have a

15  second to make sure I didn't forget anything I

16  wanted to...

17      I do want to point out as one final factor that

18  plaintiffs in this case are asking for injunctive

19  relief beyond that confined to the parties in this

20  case, which the Court is not authorized to impose.

21  The Court's not authorized to grant injunctive

22  relief that extends to non-parties.

23      But even if the Court were; and this is as

24  to -- even as to the members of the plaintiff's

25  organization; the Court needs to consider that

1  carrying a FOID card in the state of Illinois is not
2  synonymous with legal ownership of guns.
3      As the affidavits attached to defendant's
4  response establish, there have been cases where
5  courts in Illinois, circuit courts, have given
6  orders that FOID cards had to be issued to persons
7  that are prohibited from carrying firearms by
8  federal law.  That federal law, of course, only
9  extends to firearms that travel in interstate
10  commerce.  But since there are no firearms
11  manufacturers in the state of Illinois, that pretty
12  much ferrets out anything that isn't homemade.
13      But there are also limitations on the ability
14  to do background checks.  Limitations that on a cost
15  benefit analysis the state has accepted in the case
16  of firearms in the homes and firearms outside of
17  incorporated areas that the state of Illinois might
18  well impose greater checks and balances before they
19  would ever allow people to carry firearms on the
20  streets of the state of Illinois.
21      And that needs to be considered, that there are
22  limitations currently on the ability to regulate who
23  has the mental means, who has the criminal
24  background that would allow them to carry firearms.
25  So that the two are not synonymous.

1        Finally, I would like to address the suggestion
2   that the Court should jump to the permanent
3   injunction question today and skip any question of
4   discovery and evidence in this case.  That is
5   directly contrary to Ezell.  Or more correctly, we
6   do believe the Court could grant judgment for the
7   defendants without any evidence certainly on our
8   motion to dismiss.
9        We believe that if the Court is applying
10  intermediate scrutiny, the plaintiffs have not
11  challenged application, they've challenged whether
12  or not intermediate scrutiny is appropriate, but
13  they haven't challenged how we've applied that.
14       And if, in fact, intermediate scrutiny is what
15  the Court uses to ultimately view the statute, the
16  application as suggested in our brief would show
17  that the Court can enter judgment for the defendant
18  on the merits.
19       However, if the Court were to find that higher
20  level scrutiny is appropriate when the Court rules
21  on the motion to dismiss, the Court cannot enter
22  judgment for the plaintiffs at that stage because
23  Ezell indicated that if any higher level of scrutiny
24  is being applied the Court needs to have data and
25  expert opinions; and criticized the City of Chicago

1    for having not offered that.

2         We have certainly supplied the Court with some

3    data, but if the Court's applying a higher level of

4    scrutiny and believes that that's appropriate, we

5    would ask that we be allowed to present evidence,

6    that we go through the exchanging of expert

7    disclosures, and we be allowed to present expert

8    testimony on that question.

9         So before the Court can ever enter judgment on

10   the merits for the plaintiffs under Ezell, the Court

11   has to allow the opportunity for evidence and expert

12   opinion.

13        Thank you.

14            THE COURT:  Thank you, Mr. Corrigan.

15        Mr. Jensen.

16            MR. JENSEN:  Thank you, Your Honor.

17        Well, the plaintiffs don't seek the ability to

18   carry firearms anywhere or any place for any

19   purpose, first and foremost.  And that is a key

20   point that needs to be raised, particularly based on

21   the objections that have been lodged by the state.

22        There are several provisions of the Illinois

23   Penal Code that prohibit the carrying of firearms.

24   We have simply identified for this lawsuit the two

25   provision, unlawful use of weapon and aggravated

1    unlawful use of weapon, that prohibit the general

2    act of carrying firearms.

3        There are additional prohibitions; and I would

4    need to grab a copy of the statues to run through

5    all of them, but that include areas such as schools,

6    government buildings, bars, certain public

7    assemblies that are not challenged in this lawsuit

8    and that would not be enjoined by the issuance of an

9    injunction.

10       The reason that a proper -- the reason that the

11   balance of hardships looks at the harm that comes

12   from a properly regulated system is that the

13   question is not what is the suitability of the

14   current -- the question is not what legislation

15   should the state adapt.  The question is simply does

16   the recognition of this right necessarily impose

17   this cost.

18       It may very well be true that the Firearms

19   Owner Identification Card system is not an adequate

20   check on people who wish to carry guns.  More

21   pertinently, it may be true that the legislature

22   would conclude that more onerous requirements ought

23   to be imposed.

24       If the legislature does that, that is their

25   prerogative.  Under Marbury versus Madison the role

1    of this Court isn't to instruct the state

2    legislature how it should regulate the issue, the

3    issue is simply are the laws of the state as enacted

4    constitutional.

5        If the Constitution guarantees the right to

6    bear arms is a fundamental civil right, that is a

7    floor in any state law or set of state laws that

8    prohibits the exercise of that right violates that

9    constitutional floor.  There is no defense to say

10   that, well, we don't have an adequate system in

11   place.

12       And as a point of fact, when both McDonald

13   versus Chicago and Ezell versus Chicago went up, a

14   leading argument that the City of Chicago put in

15   was, hey, Court, you can't issue an injunction and

16   tell us not to enforce our laws because we're going

17   to have this regulatory vacuum.

18       In McDonald they said handguns are really

19   dangerous, we've banned them.  If you tell us we

20   can't have our ban, we don't know what we're going

21   to do, people will run around on the streets

22   shooting each other, mayhem will reign.

23       In reality the Supreme Court issued its

24   decision four days later that the City of Chicago

25   city council had enacted regulations to comply.

1    That's also what happened when Heller came down.

2         In Ezell Chicago came in and said, well look,

3    shooting ranges are really dangerous; talking about

4    people discharging guns in a densely populated city.

5    How can you simply force us to allow people to do

6    that?

7         Well, the reality is the City of Chicago

8    actually passed a law allowing gun ranges one day

9    before the Ezell decision came down.  And Ezell,

10   towards the end of the decision, spends a fair

11   amount of time discussing the fact that the notion

12   of a regulatory vacuum is no grounds for denying an

13   injunction because the ramification of that would be

14   that the state doesn't need to comply with the

15   constitution as long as it's already not complying

16   with the constitution.

17        Under this reasoning the school district in

18   Topeka, Kansas, would still be segregated because

19   all the kids would have died, or pardon me, would

20   have graduated, and there would be no remaining live

21   dispute.  Or otherwise stated, the school district

22   would still be segregated because the school board

23   could come in and say, well, desegregating the

24   school is going to be really complicated, we don't

25   have a system in place, how can you force us to do

1    it.

2        The reality of the situation is that the

3    court's role is simply to declare whether or not

4    what the state has done satisfies constitutional

5    requirements.  If what the state has done does not

6    satisfy constitutional requirements, then the

7    Court's duty is to say so.  And it then becomes

8    incumbent on the state to adopt a regulatory process

9    that satisfies the constitutional requirements.

10       So in this way really the issue simply comes

11   back to is there a general right to carry guns in

12   public.  The reality is that Ezell's discussion of

13   irreparable injury does not actually add that much

14   to the dispute -- to this dispute, and likely any

15   other Second Amendment dispute, because it is

16   relatively well established that the deprivation of

17   constitutional rights is irreparable injury so long

18   as we are not talking about a deprivation that looks

19   to money damages; for example, a deprivation for the

20   taking clause.

21       So for the 7th Circuit to say, hey, you're not

22   letting people keep and bear arms, but they have a

23   fundamental right to do so, that's irreparable harm,

24   is really somewhat unremarkable.  Having said that,

25   because the 7th Circuit has made that point any

1    doubt has been removed.  If there is a right to

2    carry guns in public then the deprivation of that

3    right is per se irreparable injury.  That is the

4    very nature of what it means to enumerate something

5    as a constitutional guarantee in the first place.

6             THE COURT:  I only wish the Second

7    Amendment were as explicit as you are in your

8    argument.  It would have made it a lot easier.  If

9    the Supreme Court has also used those very words, it

10   would make this case easier.

11            MR. JENSEN:  I would actually say that the

12   Supreme Court did on the facts it could view on the

13   facts in Heller, because the plaintiff in Heller, as

14   well as the plaintiff in McDonald, purposefully

15   confined their claims to the home and said we want

16   to possess and carry guns in our home, we don't want

17   to go any further.

18       The Ezell court actually noted that explicitly,

19   which is something we put in our reply.  You're

20   nodding.  But simply that the court didn't need to

21   go any further than that.  It's not a matter that

22   the court said, hey, the Second Amendment ends at

23   the home.  It's a matter that the complaint ends at

24   the home.  That's as far as the court needs to go.

25   But that doesn't diminish the fact that the court

1   couldn't decide that case without reaching that core

2   legal ruling.  Even if it could, it didn't, and that

3   could not be removed from the court's decision

4   without undermining the analytic foundations for it.

5        Finally, you know, I am loath to even go there,

6   but the resort to statistics is essentially

7   impertinent.  This is a court of law, not a court of

8   social science.  About the only thing that really

9   matters is the observation that the simple fact that

10  states are allowing people to keep and bear arms is

11  not of necessity associated with people running

12  around and shooting people like lunatics.

13       If that were the case then what we would see,

14  and what we do not see, is that Illinois would have

15  the absolute lowest rate of violent crime or

16  firearms related crime in the country.  The reality

17  is there are -- there's a lot more factors that go

18  in to some end of the data result like that to

19  plausibly say, well hey, this is what is going to

20  result if you take this regulatory choice off the

21  table.

22       I guess I think that a final point that needs

23  to be made is that the state's argument largely

24  concedes that 19th century jurisprudence on the

25  question what does the term "bear arms" mean

1    recognizes a general right to carry guns.

2         And while there may be some disagreement with

3    the result, I still haven't heard anything that

4    undercuts the fact that the Supreme Court reached

5    that conclusion to interpret the phrase "keep and

6    bear arms".  And not only that, the Supreme Court

7    largely grounded its conclusion on its own review of

8    19th century authorities.

9         So in that way the invitation to come in now

10   and say, well, let's review all those 19th century

11   authority to see if they, in fact, recognize the

12   general right to carry guns, is really just an

13   invitation to revisit the core of the Heller

14   decision.

15        The appeal to looking to English common law is

16   itself largely a concession that under the standard

17   that governs in the 7th Circuit, which is how is the

18   right to keep and bear arms understood in 1868 when

19   the Bill of Rights became binding against the

20   states, that under that standard they can't pass --

21   the Illinois laws cannot pass scrutiny.

22        But be that as it may, the Heller court itself

23   discussed the role of English common law and its

24   relation to the Second Amendment at some length.

25        One aspect of that discussion that is somewhat

1    missed in the state's argument is that falling at

2    Page 627 of the Heller decision where it discussed

3    historical prohibitions on the carry, going riding

4    or armed with dangerous and unusual weapons in a

5    manner that was likely to frighten the populace.

6         What the court's discussion does not accept is

7    this proposition that there was a simple blanket ban

8    on keeping and bearing arms in English law.  The

9    reality is that -- the adoption of the Second

10   Amendment was largely a response to England's

11   attempt to disarm the colonies.

12        So looking to English law and saying English

13   law defines the right of -- defines the boundaries

14   of the right to keep and bear arms, when the English

15   never codified the right as a constitutional

16   amendment is a little bit misplaced.

17        The reason that the American colonists proposed

18   the Second Amendment after reviewing the

19   constitution is that they wanted to make sure that

20   that right, the right to possess and carry firearms,

21   would be protected as an absolute constitutional

22   matter.

23        Your Honor, unless the Court has anything

24   further, that's all we have.

25             THE COURT:  Thank you, Mr. Jensen.

1        I'll take this matter under advisement and I

2    will try to issue an opinion directly.  I will not

3    promise it will be tomorrow.  You've both raised

4    substantial arguments in addition to what was in

5    your briefs.  I'm not being critical by any means,

6    but I appreciate the clarifications that you've

7    given me today.  And I have quite a bit of work to

8    do before I issue my ruling.

9        Thank you.

10        (Whereupon court was recessed in this case.)

11

12    I, KATHY J. SULLIVAN, CSR, RPR, Official Court

13    Reporter, certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17

18

19

20                    This transcripts contains the

21                    digital signature of:

22

23                    Kathy J. Sullivan, CSR, RPR

24                    License #084-002768

25