IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL MOORE, CHARLES HOOKS, PEGGY FECHTER, JON MAIER, SECOND AMENDMENT FOUNDATION, INC., and ILLINOIS CARRY, | ) ) ) ) | Case No. 3:11-CV-3134 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LISA MADIGAN, in her official capacity as Attorney General of the State of Illinois, and HIRAM GRAU, in his official capacity as Director of the Illinois State Police, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

SUPPLEMENTAL DECLARATION OF ALAN GURA

     I, Alan Gura, am competent to state and declare the following based on my personal knowledge.

BILLING RATE ISSUES:

     1.     Defendants' response to the petition for attorney fees is substantially incomplete and formatted in a materially misleading manner.

     2.     On March 3, 2014, I served responses to Defendants' interrogatories. A true and correct copy of those responses is attached hereto as Exhibit 1.

     3.     Defendants' Exhibit 1 is *not* a true and correct copy of my discovery responses.

     4.     Significantly, the Defendants formatted their exhibit 1 so that my response to interrogatory 6 appears below my restatement of their interrogatory 3, making my response to

interrogatory 6 appear to be my response to interrogatory 3, and omitting my responses to interrogatories 3 through 5 entirely. As the Court can see, my alleged response in Defendants' exhibit jumps from page 3 to page 9.

5.      Also on March 3, 2014, I served Defendants with a response to their Request for Production of Documents. A true and correct copy of that response is attached hereto as Exhibit 2.

6.      As the Court will recall, Defendants had sought leave to serve interrogatories and, if necessary, to take depositions of counsel. Defendants *never* sought authorization to serve document requests. Indeed, this Court precluded the service of document requests when, on January 2, 2014, this Court *ordered* that Defendants would "be allowed to take discovery *limited to* interrogatories and, if necessary, depositions . . . ." Text Order, 1/2/2014 (emphasis added).

7.      Accordingly, my co-counsel and I refused to produce any documents because, first and foremost, the request was unauthorized and in violation of this Court's order. Defendants *never* met and conferred about this, or any other, discovery issue.

8.      On April 24, 2014, I served Defendants with a supplemental response to interrogatory 3. A true and correct copy of that response is attached hereto as Exhibit 3.

9.      My supplemental response to interrogatory 3 is not included within Defendants' exhibits.

10.      In response to interrogatory number 3, I related that I was retained to provide legal services at a rate of $600/hour *prior* to the resolution of this case, while an of counsel at my firm was retained at a rate of $400/hour, and that we have billed and collected at those rates. Furthermore, my original interrogatory 3 response related that I was retained at my current rate of $640/hour, although I had not yet billed at that rate. My supplemental response to interrogatory 3 confirmed that I had *billed and collected* at that rate once that work was completed, and I identified

2

the task for which I was retained: an amicus brief before the Ninth Circuit on a Second Amendment matter.

11.     My response to interrogatory number 4 provided a detailed list of every case in which I charged the $300 rate that I charged the Second Amendment Foundation here. *All of these cases involved representing the Second Amendment Foundation in Second Amendment, public interest matters*.

12.     Also in my response to interrogatory number 4, which Defendants omitted, I declared that over the past five years, *I had not charged on an hourly basis in any other matter at any rate other than my standard rates*.

13.     My response to interrogatory number 5, which Defendants omitted, provided information about the rates at which courts have awarded me attorneys fees in Second Amendment cases. Most notably, the Northern District of Illinois awarded me fees at a rate, negotiated with the City of Chicago in settlement of our dispute, of $539/hour for *McDonald* v. *City of Chicago*. But that was three years ago, and in any event, Defendants here have refused to negotiate at all.

14.     All of my responses to the interrogatories propounded by Defendants and submitted here in full are true and correct.

15.     The responses that Defendants omit allow them to make the false claim that I "have demonstrated that [I am] willing to accept this rate from a paying client in this case." That is false, and the discovery responses I provided Defendants, which they conveniently omit here, prove it.

16.     As I declared in moving for fees, "I would not have undertaken this representation absent the prospect of a Section 1988 recovery because there is a limit as to how much time I am willing to work for below-market rates without hope of recovering the value of my time." Gura Decl., 12/16/13, ¶ 12. As set forth in my response to interrogatory 1, which Defendants could

apparently not cut-and-paste around, my fee agreement with the Foundation here expressly stated that the rate charged the Foundation was below market and that I undertook the representation with the express purpose, as allowed by law, to recover my true market rate upon prevailing.

17.     As my background and experience bear out, my responses to interrogatories 3 and 4, which Defendants omitted, prove that my market rate is at least $640/hour, and that I have *only* charged this particular discounted rate to cases involving this *one client*, and only in Second Amendment matters. I am not seeking a contingency above my established rate, because I *have*, in fact, billed and collected at up to $640/hour, and with all due respect, given my background and experience, that is a very fair rate for the type of work that I perform.

18.     My professional activities since the filing of this fee petition continue to confirm the reasonableness of my established rate. For example, the Harvard Law Review Forum published my commentary on the recent Second Amendment case, *Peruta* v. *County of San Diego*, 742 F.3d 1144 (9th Cir. 2014). *See* Alan Gura, *The Second Amendment as a Normal Right*, 127 Harv. L. Rev. F. 223 (2014). Moreover, I have joined the faculty of the Georgetown University Law Center as an Adjunct Professor of Law. Beginning in the Spring 2015 semester, I will be teaching "Strategic Litigation for Social Change." *See* http://apps.law.georgetown.edu/curriculum/ tab_courses.cfm?Status=Course&Detail=2500 (last visited June 2, 2014).

19.     The two Springfield area lawyers who have come into this case to oppose my fee request, Russell Reed and Stephen Kaufmann, appear to be insurance and government tort defense attorneys who have represented state officials and employees. While Messrs. Reed and Kaufmann may be fine attorneys, insurance and government defense work is a saturated field that does not command very high rates, indeed, it is often among the lowest-paying sectors of the legal industry. This is a well-known fact in the legal industry and has been for quite some time. *See, e.g.*, Herbert

4

Kritzer, *The Commodification of Insurance Defense Practice*, 59 VAND. L. REV. 2053 (2006).
And given their relationships with the State of Illinois, it is doubtful that these attorneys would have
sued the state over anything, let alone Second Amendment violations. Based on my experience and
knowledge of the legal industry, it is absolutely not fair to establish a market rate for any community
by looking to two insurance/government defense attorneys—and neither of these gentlemen are
disinterested, given their connections with the State of Illinois.

20.      Of course, I am not an insurance/government defense lawyer and do not look to that
field to establish my rates. Interestingly, the Defendants omitted my restatement of their
interrogatory 6 which, with its answer (which they posed as the answer to interrogatory 3), reveals
that I have not represented any government agencies in litigation since I was a salaried Deputy
Attorney General in California in 1998.

21.      Thus, to take nothing away from these gentlemen, they simply do not practice in my
field. For example, I do not have any "high volume clients" nor do I generally take cases "involving
serious injury," Reed Decl., ¶ 9, at least not in the sense implied by Mr. Reed's insurance defense
biography on his firm's website. I do not recall ever being contacted by a client seeking my
representation with an insurance/government tort defense matter. And while I generally find it
distasteful for lawyers to compare themselves to each other, I did not invite the comparison between
my billing rate and those charged by Messrs. Reed and Kaufmann. So most respectfully, on this
topic, I would merely submit that our career paths have differed, and mine fully justifies my rate.
Moreover, it is entirely possible that Reed and Kaufmann might be able to charge at my rates or
higher were they to pursue cases such as this, or at least, to abandon the low-paying, over-saturated
insurance/government tort defense field for almost any other area of litigation practice.

22.     My Second Amendment and appellate expertise undoubtedly saved Defendants money in this litigation. For example, much has been made, in the *Shepard* matter, that I took less time than did *Shepard* counsel to prepare for the appellate argument in this case. As the recording of that argument and the Seventh Circuit's opinion reveal, I was not unprepared for the argument. It took me less time to prepare for argument in this case because by the time of that argument, I had already argued cases involving the Second Amendment right to carry guns for self-defense before the First and Tenth Circuits; the United States District Courts for the Eastern District of California and the District of Maryland; and twice before the United States District Court for the District of Columbia. I was also required to be conversant in the issue to argue *Heller* and *McDonald* before the Supreme Court, and had spoken about the right to bear arms at countless law school events and continuing legal education seminars. Were I, like Messrs. Reed and Kaufmann, an insurance defense attorney with no apparent Second Amendment background, let alone significant experience arguing and lecturing on the specific questions presented by this case, I would have had to spend considerably more time to prepare for the argument in this case. Attorneys who charge more are expected to perform their work more efficiently, as higher rates should reflect the value of experience and specialized knowledge, and that is absolutely a feature of this fee petition.

23.     To the extent that Defendants challenge the admissibility of my previously offered Exhibits A and B, those are, quite obviously, what they purport to be: court filings of which this court must take judicial notice. Fed. R. Evid. 201(c)(2)(c). To the extent Defendants challenge the admissibility of my previously offered Exhibits C, D, and E, those are true and correct copies of what they purport to be: excerpts from the 2012 National Law Journal Billing Rate Survey, Dec. 17, 2012. These documents are self-authenticating. Fed. R. Evid. 902(6).

## EXPENSE ISSUES

24.      Defendants object to my $50.22 cab ride from O'Hare airport to my hotel in downtown Chicago. "Defendants should not have to pay trip." How else was I supposed to get from the airport to the hotel? I do, on occasion, take the blue line train from O'Hare to downtown Chicago, particularly if arriving in the morning when traffic in that direction is heavy. But under the circumstances, considering I had a significant Seventh Circuit argument the next morning, I opted for a cab—a perfectly appropriate decision. If "Defendants should not have to pay trip" is a typographical error, and Defendants mean that they should not have to pay for a "tip," considering they allow $41.85, that attitude is appalling.

25.      In our country, including in the City of Chicago, it is customary to pay cab drivers a small gratuity for good service. Tips are part of the cab driver's compensation and are factored into the cost of owning or leasing one's cab. I withhold tips from cab drivers only in the very rare event of poor service, meaning—because tipping is customary and presumptive—that the cab driver engaged in behavior that he should have expected would result in the loss of a tip.

26.      The cab driver in this instance earned his tip, and I am not a jerk who stiffs cab drivers.

27.      The amount was suggested automatically by the cab's credit card reader, so it might well be customary in Chicago and in any event was not too high—our time here is being wasted over $8.37!—to mess with the machine over it. In any event, the Defendants are not arguing over the amount of the tip, but over *any* tip being given for the lengthy cab ride between O'Hare airport and downtown Chicago. Because tipping is normal and customary and part of what we pay cab drivers in this country, the cabbie's tip is a recoverable expense under Section 1988.

7

28.     It is petty for opposing counsel to waste the Court's time, and my time, haggling over whether I should have stiffed the cab driver. My clients and I are entitled to compensation for the cab driver's tip, and in a significant supplemental fees and costs motion that is sure to come, for the cost of litigating over this issue. Considering Defendants never even attempted to negotiate over fees and costs, but proceeded directly to scorch the earth in this manner, it is difficult to see how opposing counsel are serving the taxpayers' interests.

29.     Everything that might be said about the cab driver's tip may be said about tipping waiters. Mr. Sigale and I found the service we had at our lunch worthy of a tip, and so I provided a normal tip. I usually tip waiters 15%-20%. I would only withhold a tip from waiters for actual hostility, or for ignoring me for long periods of time relative to the waiter's apparent workload. Nobody from the State of Illinois was present at that lunch and thus has any standing to challenge the quality of the service we received.

30.     Defendants think that Mr. Sigale and I should have shared a dinner in downtown Chicago, presumably including tip (because they didn't object this time), for $16, or $8 a person. That is ridiculous. We ate at my hotel restaurant, which was fine but not extravagant, and $81 at a hotel restaurant for two professional people to have dinner in downtown Chicago, including tip, is absolutely within accepted business practices.

31.     Defendants think that Mr. Sigale and I should have shared lunch near O'Hare airport for $8, or $4 per person. That, too, is ridiculous, with or without a tip. And Defendants should be grateful that I did not take a cab back to O'Hare, but rather accepted a ride, and shared lunch, with Mr. Sigale. The cost of that foregone cab ride would have doubtless exceeded that of Mr. Sigale's lunch, not to mention the difference in the price of my lunch had I purchased it inside the airport.

32.     Nor does one get much at our nation's airports, in terms of coffee and light snacks, for $8 over a period of two days, or $4 a day. I am very well acquainted with the price of food and coffee at our nation's airports, including, specifically, Chicago's O'Hare airport and Washington's Reagan National. My purchases were absolutely normal—a cup of coffee at Dunkin Donuts and a Fuddruckers salad as lunch on the flight out, one Starbucks latte for the flight back. It is difficult to believe that this is what we are litigating over, again, especially as the Defendants refused even to negotiate. But, Section 1988 plainly entitles clients to buy their attorneys a cup of coffee and a salad when flying to appellate argument.

33.     I regularly travel throughout the United States, including to Chicago, on business for non-profit organizations. I have done so for many years. I am well-aware of acceptable customs and practices for business travel that would be reimbursed by non-profit clients. I have never had a client question my travel expenses.

34.     Although Section 1988 entitles my client to recover reimbursement for my business travel at the normal rate that other professionals would incur on behalf of for-profit clients, I am always keenly aware that there is no guarantee that my clients would attain prevailing party status, as they did in this case. Accordingly, I take extra care to reduce my travel expenses when traveling for the Second Amendment Foundation. My travel choices reflected that care.

35.     Accordingly,  I did what normal attorneys from the Washington, D.C. area do when arguing before the Seventh Circuit. I flew economy to Chicago, booked a standard hotel room at a Hilton within walking distance of the courthouse, and ate at the hotel restaurant the night before the argument. On the way home following the argument, my co-counsel David Sigale gave me a ride to the airport, saving the client (and now, the Defendants) the cost of a cab ride, and we grabbed a bite at an ordinary family restaurant near the airport.

9

36.     The hotel in which I stayed, the Palmer House Hilton, is a large, perfectly typical hotel suitable for business travel. Its large size indicates that many business travelers to Chicago utilize it. While my luxury hotel experience is regrettably limited, it suffices to supply me with great confidence in declaring that this particular hotel, while very nice, is not a higher-end luxury hotel. I have never seen it listed among the more expensive hotels in Chicago. When I booked this hotel for the Seventh Circuit argument, its price was very reasonable in the context of the relevant market, which is part of why I selected it. It was very far from the most expensive choice.

37.     It is exceedingly rare to see a business hotel, or even a budget hotel, within walking distance of the federal courthouse in downtown Chicago, offer a room for $130 per night. I have just today run a search on expedia.com for hotels in the loop for the night 21 days hence, June 24. The average hotel price returned by Expedia is $275, with the 3 star average at $238 (the rate Defendants contest was $239, plus tax). The only lodgings offered at or below the state's $130 rate are a $99 hostel, and the Ohio House Motel for $130, although that price may be exclusive of tax.

38.     Illinois has not repealed the law of supply and demand. In my experience, hotel prices in Chicago, as elsewhere, fluctuate from time to time. I have paid much more to stay at less-nice hotels in Chicago during times of greater demand. Defendants are fortunate that the argument in this case did not happen to take place at a time where even substandard hotel rooms could fetch as much or more than what I spent for the hotel on this trip.

39.     I am not an employee of the State of Illinois, and thus have no access to the special rates that the state has negotiated for its employees while traveling on state business, or to the special rates that travel providers might choose to extend to Illinois state employees.

40.     I know a few things about booking hotels for travel as a state employee. Having previously served as a Deputy Attorney General for California, a position that regularly required me

10

to travel for court appearances throughout a large portion of that state, I can declare that state attorneys are afforded hotel rates that are substantially below any rate offered to the public. The state has vast bargaining power over hotels.

41.    Whatever per diem limits the State of Illinois imposes upon its employees while traveling is a condition of employment over which state attorneys should be able to bargain, including collectively. (During my employment as a California Deputy Attorney General, I was represented by the CASE union, which bargains collectively over such items. *See* Article 12, http://www.calattorneys.org/download.cfm?ID=30056.)  That Illinois attorneys accept meager allowances for travel is their business, but it must be remembered that public employment also affords various advantages not available to those of us in the private sector. I might accept these limitations on my business travel expenses in exchange for other benefits, which my clients cannot provide. But in any event, I'm not a government attorney anymore, and these travel allowances do not remotely reflect normal customs and practices for business travel in the private sector. Based on my extensive travel experience, I am comfortable declaring that the per diem amounts Defendants provided are absurdly low for business travel to Chicago, one of America's most expensive cities.

<u>TIME ENTRIES</u>

42.    Defendants object to various time entries because I did not enter an appearance in the District Court, and there was allegedly "no evidence of contractual relationship with clients." These objections are frivolous. Appellate counsel frequently work with trial counsel in structuring cases where appellate litigation is contemplated. And there is no rule or custom that provides that every single attorney who works on a case must actually enter an appearance before a court in order to work on or bill for it. I did, in fact, have an agreement to represent these clients at all times I listed in my fee request. All of these entries were taken from actual bills sent to the Foundation.

11

43.     There is nothing vague about my time entries, and Defendants do not claim to not understand any particular entry. Indeed, entries are supposed to be of the type that a paying client would not question, and the Second Amendment Foundation paid me for each and every time entry, without question, and without any guarantee that it would eventually recover these fees.

44.     Defendants appear to claim that everything is "duplicative" if it was done in participation with my co-counsel. This, too, is highly frivolous. If two attorneys meet for an hour, then the bill is for two hours of attorney time. If we speak on the phone, then each attorney is entitled to bill for his time. An attorney does not bill at half time for speaking with another attorney. This case was by no means overstaffed. It plainly required the services of three attorneys, and indeed, the fact that it was staffed by *only* three attorneys is a sign of extreme efficiency.

45.     Defendants question half an hour of time spent conferring with counsel and members of the Illinois State Rifle Association regarding legislative proposals at the outset of this case. This time was reasonable and well-spent. We must be aware of the legislative climate surrounding our litigation and the manner in which it might be impacted by the same. My Second Amendment cases in Illinois are routinely impacted by legislative developments.

46.     Defendants question the fact that I spent 2 hours drafting a Rule 28(j) letter to the Seventh Circuit regarding *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), dickering that I should have spent only 1 hour on the letter because the letter is limited to 350 words. That is patently ridiculous. *Kachalsky* was a significant development, and a rather voluminous, complicated opinion. Rule 28 letters consume a great deal of time to carefully craft precisely because we must effectively distill a great amount of information into a concise, persuasive form. The letter would have taken me no more than two minutes to craft if all I had to write was, "the Second Circuit decided an important case, but erred, and this Court should ignore it." Two hours per

12

page of appellate argument is not unreasonable, and in my experience, on a per word basis, nothing is more time consuming than drafting 28(j) letters.

47.     Defendants object to the time spent opposing their motion to stay the mandate because we allegedly "did not prevail on [the] issue."  That is false. The request for staying the mandate was not an "issue" in the case. It was an event, and it is black-letter law that counsel are entitled to recover for reasonably warranted even if unsuccessful procedural motions. A "claim," for purposes of Section 1988, is a request for relief for an injury on the merits of the case. See, e.g. *Copeland v. Marshall*, 641 F.2d 880, 892 n.18 (D.C. Cir. 1980). Accordingly, the test for whether time is compensable is whether it was "reasonably expended" in the litigation, a question essentially of billing judgment. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

48.     Under the circumstances, it was absolutely reasonable for us to oppose the stay of mandate and, indeed, our opposition doubtless factored into the Seventh Circuit's decision, in granting Defendants' request, to declare that it would be the last such request considered. I would seriously question the competence of any attorney who, having obtained an appellate decision declaring that his clients' fundamental rights are being violated, would do nothing in the face of a request to extend those violations for thirty days, especially after the court has already stayed its mandate for 6 months.

49.     Likewise, it was absolutely necessary to consider the issues that might be presented for Supreme Court review at the outset of this case, especially as Defendants would later twice move for an extension of time to petition for a writ of certiorari. It was absolutely necessary for counsel to discuss the implications of this Court's opinion denying Defendants' motion to dismiss. And Defendants' claim that we did not prevail on the prevailing party status issue is, at best, premature. If we are discussing the amount of fees, we prevailed.

50.     Defendants' objections to time spent preparing for this fee petition because it was not yet due are frivolous. Counsel were required to prepare and plan for the fee petition which was, obviously, filed.

51.     Defendants are correct that "Shepard did not advance this litigation." But it would have been reckless for us not to read that opinion and study how that case interacts with this one.

52.     Finally, Defendants' arbitrary attack on the hours billed for preparing the fee petition is unwarranted. Owing to the complexity of the petition and the underlying case, the time spent was plainly reasonable. And indeed, as will be shown in our supplemental fee petition, Defendants' intransigent, scorched earth posture in this fee dispute—e.g., misrepresenting discovery responses, and arguing over whether counsel represented the clients, whether the plaintiffs prevailed, whether cabbies and waiters should be tipped, whether counsel has access to state rates at hotels, etc.—will not prove to have been of great service to the taxpayers.

I declare under penalty of perjury that the foregoing is true and correct.

This the 3rd day of June, 2014.

_____
Alan Gura